JAMES GAMBLE, Respondent, *v.* THE QUEENS COUNTY WATER COMPANY et al., Appellants.

An owner of property is not debarred from selling it to a corporation of which he is a stockholder and trustee, so long as he does not while acting in his own interests, also act as trustee or representative of the corporation.

A shareholder has a legal right, at a regular meeting of the shareholders of a corporation, to vote upon a measure, even though he has a personal interest therein separate from the other shareholders. In such a meeting each shareholder represents himself and his own interests solely, and in no sense acts as a trustee or representative of others.

*It seems*, however, where the action resulting from the votes of the shareholders owning a majority of the stock of a corporation is so detrimental to the corporation itself as to lead to the necessary inference that the interests of the majority lie wholly outside of and in opposition to the interests of the corporation and of the minority of the shareholders, and that such action is a wanton or fraudulent destruction of the rights of the minority, it may be subjected to the scrutiny of a court of equity at the suit of the minority shareholders.

Where, in such case, the directors or trustees have acted with and formed part of the majority, an action may be sustained by one of the minority shareholders, suing in his own behalf and in that of all others coming in, to enjoin the action contemplated.

In such suit the corporation should be made a party defendant.

*It seems,* that as to questions of mere administration, or of policy, as to which there is an honest difference of opinion among the shareholders, the will of the majority should govern, and so the court would not be justified in interfering, even in doubtful cases, where the action of the majority might be susceptible of different constructions. To warrant the interposition of the court where the proposed action is within the corporate powers, a case must be made out which plainly shows 'that such action is so far opposed to the true interests of the corporation itself as to necessarily lead to the inference that none thus acting could have been influenced by an honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company and in a manner inconsistent with its interests.

*It seems,* a corporation organized under the General Manufacturing Act (Chap. 40, Laws of 1848) may not issue its stock, as full paid, in payment for property purchased at anything less than its par value.

The distinction in this respect between manufacturing and railroad corporations pointed out.

*Van Cott* v. *Van Brunt* (82 N. Y. 535), distinguished.

*It seems,* however, a manufacturing corporation has power to issue its bonds at less than par, either for money or in payment for property, and the repeal of the statute of usury, so far as it regards corporations, operates to give validity to corporate bonds negotiated at less than par.

*Duncomb* v. *N. Y. H. & N. R. R. Co.* (48 N. Y. 190), distinguished.

One M. constructed an extension to the works of a water-works company, in which he was a stockholder and also a director, at his own expense, and under no contract with the company. At a regular meeting of the stockholders a resolution was passed to purchase said extension and pay M. therefor $110,000 in stock and bonds of the company. M. voted on the shares owned by him in the affirmative. Shareholders owning a majority of the stock, not including plaintiff's, voted for the resolution. In an action to restrain the corporation and its directors from carrying out the resolution, it appeared that including a charge of $8,000 for the services of M. and of one D., also a director, who was employed by M. to assist in the work, and a charge of $1,800 for interest, the cost of the work was $69,055.79. *Held,* that in the absence of any evidence or claim that the charge for services was excessive, it was proper to include it, and also the charge for interest.

Also, *held,* that M. had the right, in selling to the corporation, to charge a fair profit on the work.

While showing the actual prices paid for some of the material M. testified as a witness for plaintiff that certain pipe he had bought to use in the extension had, when he used it, advanced four dollars a ton, and that the amount of such advance was $2,400. *Held*, it was proper to include such sum in the statement of the value of the work.

Also, *held*, that in placing a value upon the work the inquiry should be what, under all the circumstances, is the fair value of the property to the company, considering its proposed use by it and the general purpose for which the company was organized.

Also, *held*, that the possible or probable prospective value of the property might be taken into consideration upon the question of good faith on the part of the majority shareholders.

It appeared that the actual cost, adding thereto a fair profit to M., would amount to but $80,000 or $85,000. *Held*, that conceding this to be the value at the time of the proposed purchase, and without taking into consideration the advantage to the company of having a work needed by it ready for it to take possession and operate, the difference between this sum and the par value of the stock and bonds, in the absence of some proof of bad faith on the part of the majority, did not condemn the resolution as a fraud.

*Gamble* v. *Q. C. W. Co.* (52 Hun, 166), reversed.

(Argued June 11, 1890; decided October 7, 1890.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made April 3, 1889, which affirmed a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

This action was brought to perpetually enjoin the corporation defendant from carrying out a resolution of part of its stockholders for the issuing of stocks and bonds of the company to purchase of and pay Robert F. Mullins, one of the defendants, and the secretary and treasurer, and also a director of the corporation, for an extension of water-works constructed by him, for which the trustees, of which he is one, agreed or resolved to issue to him $110,000 in new stock and bonds, in payment of such property, which the trial court found to be of the value of less than $61,000.

The facts, so far as material, are stated in the opinion.

*William B. Hornblower* for appellants. The judgment cannot be sustained on the theory of fraud. (*Thomas* v. *B.*, *etc.*, *R. R. Co.*, 109 U. S. 522; *Gardner* v. *Butler*, 30 N. J. Eq. 702; *G. L. R. Co.* v. *Magway*, 25 Beav. 595; *N. C. N. R. Co.* v. *Simpson*, 23 Fed. Rep. 214; *L. S. I. Co.* v. *Drexel*, 90 N. Y. 87, 93; *Schenck* v. *Andrews*, 57 id. 142; *Boynton* v. *Andrews*, 63 id. 94; *Douglass* v. *Ireland*, 73 id. 100; *Brockwood* v. *Ireland*, 61 How. Pr. 372; *Lebke* v. *Knapp*, 79 Mo. 24; *Knowles* v. *Duffy*, 40 Hun, 486; *Thurber* v. *Thompson*, 21 id. 472; *Carr* v. *Le Fevre*, 27 Penn. St. 413, 417.) Nor can the judgment be sustained on the ground of fiduciary relationship between Mullins and the corporation. (*M. E. R. Co.* v. *M. E. R. Co.*, 11 Daly, 373; *Hotel* v. *Wade*, 97 U. S. 13; *T. L. O. Co.* v. *Marbery*, 91 id. 587; Cook on Stock. [2d ed.] § 653; *N. W. T. Co.* v. *Beatty*, L. R. [12 App. Cas.] 589; *Willace* v. *L. I. R. R. Co.*, 12 Hun, 460.) In an action by a stockholder, the presumption is that the purchase is a good one for the corporation, and the burden of proof is on the plaintiff to show the contrary. (*MacNaughton* v. *Osgood*, 41 Hun, 109; *Veeder* v. *Mudgett*, 95 N. Y. 295.) Mullins, having violated no duty to the company in building the extension, was at liberty to sell it to the company for the best price he could get. (1 Morawetz on Corp. § 521; *Parker* v. *Nickerson*, 137 Mass. 488; *Inglehart* v. *T. I. H. Co.*, 32 Hun, 377.) It is not illegal to issue stock and bonds for constructing works, although the cost of such construction is less than the face value of the stock and bonds. (*Van Cott* v. *Van Brunt*, 82 N. Y. 535, 540; Laws of 1854, chap. 282, § 16; *M.*, *etc.*, *R. R. Co.* v. *Dow*, 120 U. S. 287; *P. & S. R. R. Co.* v. *Thompson*, 103 Ill. 187, 201; *Curtis* v. *Leavitt*, 15 N. Y. 1, 66; *Ellsworth* v. *S. L. & T. H. R. R. Co.*, 98 id. 553; *C. G. M. Co.* v. *Platt*, 3 Daly, 263; *W. W. V. C. Co.* v. *Vallette*, 21 How. Pr. 414; *In re Compagnie Generale De Bellgarde*, L. C. [4 Ch. Div.] 470; *In re A. D. S. N. & C. Co.*, L. R. [20 Eq. Div.] 339; *Otter* v. *B. P. Co.*, 50 Barb. 255; *Lorillard* v. *Clyde*, 86 N. Y. 384; *Stein* v. *Webb*, 65 Cal. 616; *Reeve* v. *Hoyt*, 17 N. Y. S. R. 157; *Chris-*

*tensen* v. *Eno*, 106 N. Y. 97 ; *Coffin* v. *Ransdell*, 9 West. Rep 33 ; *Morrow* v. *T. & S. Co.*, 87 Tenn. 262 ; 1 Morawetz on Corp. § 306 ; *Clark* v. *Bever*, 31 Fed. Rep. 670 ; Sedg. on Stat. Const. [2d ed.] 226.)  The defendant corporation can lawfully issue bonds in payment for property. (*Lord* v. *Y. F. G. Co.*, 99 N. Y. 547 ; *Munson* v. *S. G. & C. R. R. Co.*, 103 id. 58.)  Plaintiff cannot, as a stockholder, maintain a suit in equity to restrain the proposed action of the company on the ground of illegality unless he shows that he will be pecuniarily damaged thereby. (*Thomas* v. *M. P. Union*, 30 N. Y. S. R. 563.)

*James W. Perry* for respondent.  The contract or resolution in this case, the carrying out of which has been perpetually enjoined, was made by five trustees, with the defendant Mullins one of the five, against the protest and rights of the plaintiff, and is unlawful and void. (Green's Brice's Ultra Vires, 479 ; *Munson* v. *S. G. & C. R. R. Co.*, 103 N. Y. 58, 73, 74 ; *Barnes* v. *Brown*, 80 id. 201 ; *Coleman* v. *S. A. R. R. Co.*, 38 id. 201 ; *M. E. R. Co.* v. *M. R. Co.*, 14 Abb. [N. C.] 103 ; *Risley* v. *I. B. & W. R. Co.*, 62 N. Y. 240 ; *Smith* v. *Lansing*, 22 id. 531 ; *Hoyle* v. *P. & M. R. R. Co.*, 54 id. 328 ; *Davoue* v. *Farnning*, 2 Johns. Ch. 260 ; *Duncomb* v. *N. Y. H. & N. R. R. Co.*, 84 N. Y. 199.)  In a case like that here, where authorized acts are threatened to be done by the directors or trustees of the defendant corporation they may be restrained in equity at the instance of a stockholder ; and the unauthorized act or course of dealings prevented by injunction as here. (*Dodge* v *Woolsey*, 18 How. [U. S.] 331 ; *Rolf* v. *Rogers*, 3 Paige, 154 ; Angel & Ames on Corp. 310, 424 ; *Bissell* v. *M. S. & N. I. R. R. Co.*, 22 N. Y. 275, 289, 293 ; *Barnes* v. *Brown*, 80 id. 528, 535, 536 ; *Risley* v. *I. B. & W. R. R. Co.*, 62 id. 240 ; *Anderton* v. *Aronson*, 3 How. Pr. 216 ; *Brinckerhoff* v. *Bostwick*, 88 N. Y. 52 ; *Robinson* v. *Smith*, 69 id. 154 ; *Graves* v. *Gonge*, 69 id. 154 ; *Currier* v. *N. Y., W. S. & B. R. R. Co.*, 35 Hun, 360 ; *Leslie* v. *Lorillard*, 40 id. 395 ; *Gray* v. *N. Y. & V. S. S. Co.*, 3 id. 382 ;

*Hand* v. *A. Bank*, 55 id. 231 ; *Heath* v. *E. R. Co.*, 8 Blatch. 347, 393 ; *Duncomb* v. *N. Y. H. & N. R. R. Co.*, 84 N. Y. 190.) The only serious effort of the defendant on the trial of the action seems to have been to show that the property sought to be purchased of defendant Mullins was worth all the company agreed to pay for it, and that Mullins would make no profit thereby. This is wholly immaterial. (*Munson* v. *S. G. R. R. Co.*, 103 N. Y. 58, 73, 74 ; *Boynton* v. *Andrews*, 63 id. 94.) There is no authority in law for the issuing of both stock and bonds in the purchase of property, or either of them, at a discount, or for less than their face. This would be the result if $110,000 of the obligations of the company were issued in the payment of $61,000 worth of property. (*Duncomb* v. *N. Y. H. & N. R. R. Co.*, 84 N. Y. 190.) Stock issued by a corporation for the purchase of property must be issued at its face value, in order to make it full-paid stock, and not liable for further calls. (Laws of 1853, chap. 333, § 2 ; *Garnsey* v. *Rogers*, 47 N. Y. 233 ; *Boynton* v. *Hatch*, 47 id. 225 ; *Boynton* v. *Andrews*, 63 id. 93 ; *Douglass* v. *Ireland*, 73 id. 100 ; *Duncomb* v. *N. Y. H. & N. R. R. Co.*, 84 id. 190.)

PECKHAM, J. The defendant corporation was organized under the Laws of 1873 (Chap. 737), relating to the incorporation of water companies, as amended by chapter 214 of the Laws of 1881. The provisions of the General Manufacturing Act of 1848, and its amendments as to payment for capital stock, were made applicable to corporations formed under the act of 1873.

The so-called Rockaway Beach extension was not built by defendant Mullins under any contract with the defendant corporation. The plaintiff requested the court to find that he did so build it, but the court refused the request, and in the opinion delivered by the learned judge at the trial term it is distinctly stated that there was no contract between the parties for the building of such extension. Upon its completion Mullins was the sole and absolute owner thereof, with power

to operate it himself or to sell it to others, or, in brief, to exercise such acts of ownership over the property as any other owner might have exercised. This is not the case of a trustee entering into a contract with himself or purchasing from himself, where the contract is liable to be repudiated at the mere will or even whim of the *cestui que trust.* Having the rights · of an absolute owner of this extension, Mullins was at liberty to make such contract in regard to its disposal as he should see fit, so long, of course, as he did not, while acting in his own interest on the one side, also act on the other in the capacity of trustee or representative, so that his interest and his duty might conflict.

In this case Mullins did not so act. He bases his right to the stock and bonds of the company defendant upon the vote of the majority of its shareholders taken at a regularly convened meeting, to purchase the property at the price named in the resolution adopted at such meeting, the price being $60,000 in bonds and $50,000 in the stock of such company. At this meeting 497 out of a total of 500 shares, into which the capital stock of the company was divided, were represented, and 467 shares were voted upon in favor of the adoption of such resolution, while the thirty of the plaintiff were voted upon by him in opposition thereto, and three shares were not voted upon. There were a majority of shareholders and a majority of shares voted upon in favor of such resolution without counting the defendant Mullins or his shares, although he voted upon them in favor of such resolution. In so doing he committed no legal wrong. A shareholder has a legal right, at a meeting of the shareholders, to vote upon a measure, even though he has a personal interest therein separate from other shareholders. In such a meeting each shareholder represents himself and his own interests solely, and he in no sense acts as a trustee or representative of others. The law of self interest has at such time very great and proper sway. There can be little doubt, too, that at such meetings those who do vote upon their own stock vote upon it in the light solely of their own interest, or, at least, in what they con-

ceive to be their own interest. Their action resulting from
such votes must not be so detrimental to the interests of the
corporation itself, as to lead to the necessary inference that the
interests of the majority of the shareholders lie wholly outside
of and in opposition to the interests of the corporation and of
the minority of the shareholders, and that their action is a
wanton or fraudulent destruction of the rights of such
minority. In such cases it may be stated that the action of
the majority of the shareholders may be subjected to the
scrutiny of a court of equity at the suit of the minority share-
holders. These views are exemplified in the comparatively
recent English case of *N. W. T. Co.* v. *Beatty* (L. R. [12
App. Cas.] 589), where one of the directors in a company
contracted with his colleagues to sell to the company a vessel
which he owned for a price named. The contract was in fact
a fair one, but it was admitted to be voidable, and it was held
that the vendor director had a right at a meeting of the share-
holders to vote in favor of ratifying such contract and con-
cluding such purchase, and that his conduct was not to be
regarded as oppressive towards the minority of shareholders
because he individually owned a majority of the stock. It
was said that a resolution of a majority of the shareholders
upon any question with which the company was competent to
deal, was valid and binding upon the minority. A voidable
contract, it was also said, might be ratified or affirmed by a
majority of shareholders at a proper meeting, provided that
such ratification was not brought about by improper means,
and the contract itself was not fraudulent or oppressive towards
the minority. Baggallay, L. J., said that great confusion
would be introduced into the affairs of joint-stock companies
if the circumstances of shareholders voting in that character
in general meeting were to be examined and their votes
practically nullified if they also stood in some fiduciary rela-
tion to the company.

I think that where the action of the majority is plainly a
fraud upon, or, in other words, is really oppressive to the
minority shareholders, and the directors or trustees have acted

with and formed part of the majority, an action may be sus-
tained by one of the minority shareholders suing in his own
behalf and in that of all others coming in, etc., to enjoin the
action contemplated, and in which action the corporation
should be made a party defendant.   It is not, however, every
question of mere administration or of policy in which there is
a difference of opinion among the shareholders that enables
the minority to claim that the action of the majority is oppress-
ive, and which justifies the minority in coming to a court of
equity to obtain relief.   Generally, the rule must be that in
such cases the will of the majority shall govern.   The court
would not be justified in interfering even in doubtful cases,
where the action of the majority might be susceptible of dif-
ferent constructions.   To warrant the interposition of the
court in favor of the minority shareholders in a corporation
or joint-stock association, as against the contemplated action of
the majority, where such action is within the corporate powers,
a case must be made out which plainly shows that such action
is so far opposed to the true interests of the corporation itself
as to lead to the clear inference that no one thus acting could
have been influenced by any honest desire to secure such inter-
ests, but that he must have acted with an intent to subserve
some outside purpose, regardless of the consequences to the
company and in a manner inconsistent with its interests.
Otherwise the court might be called upon to balance probabili-
ties of profitable results to arise from the carrying out of the
one or the other of different plans proposed by or on behalf
of different shareholders in a corporation, and to decree
the adoption of that line of policy which seemed to it to
promise the best results, or at least to enjoin the carrying out
of the opposite policy.   This is no business for any court to
follow.

I do not understand that these views are substantially drawn
in question in the courts below, but there are facts found in
this case upon which they have thought the plaintiff was enti-
tled to their interference in his favor, to prevent the consum-
mation of the action of the majority in providing for the

issuing and delivering to Mullins of the stock and bonds mentioned in the resolution adopted by the shareholders.

So far as fraud may be made the basis for an action like this, it is to be noted that there is no finding by the court that any fraud existed in fact, or that the individual defendants or any of them were actuated by any fraudulent intent in taking the action which they did. Therefore, if the action is to be sustained on the ground of fraud, its existence must be the necessary legal-inference from facts which have been found. But the trial court made certain findings of fact from which the General Term has inferred the existence of this fraudulent purpose, and to which findings an exception was taken by defendant Mullins, upon the ground that there is no evidence to support them. A question of law is thus raised which this court is called upon to decide. These findings and exceptions relate to the actual cost of the Rockaway Beach extension.

The court found that such actual cost was not more than the sum of $65,000, including about $8,000 paid to defendants, Mullins and DuBois, for disbursements and services rendered by them in relation to the work, while they were officers and trustees of defendant corporation. It was further found that the actual net cost of the work to defendant Mullins was less than the sum of $61,000, and that the work as completed was not worth more than $65,000, while the corporation by the terms of this resolution was to pay Mullins, for the doing of such work, in bonds and stock to the amount in value of $110,000. The evidence is uncontradicted in regard to the cost and worth of these works.

It was shown that the actual expenditures for the work amounted to $69,055.79, which included labor and cost of material. There were also included in such gross amount $8,000 for the personal services of Mullins and DuBois, both of whom were, at the time when they did the work, officers and directors of the corporation defendant. Also an item of $1,300 for four months' interest on $65,000, thus making a total of these items for personal service and for interest of $9,300,

which, when deducted from the above total of $69,055.79, leaves a balance of $59,755.79, and upon this basis the finding of the court that the actual net cost of the work to Mullins was less than the sum of $61,000, may be sustained. But why should the $8,000, for the personal services of Mullins and DuBois, be deducted? The deduction is claimed upon the ground that while Mullins was engaged in the work of building this extension, he and DuBois were also officers of the corporation defendant, and, therefore, it is assumed that neither had any right to charge such company for his services. I see no rule of law which forbids such charge, nor is there any in the nature of the transaction itself. When Mullins engaged in the business of building the extension, he was under no contract with the company to build it for them. He was free to build it in such manner and at such expense as he chose, and when completed he was free to make such use of it as he chose; to keep it or to sell it to others. As he did not do the work for the company, he was not bound to give his time or labor to the work and to make no charge for it, if he subsequently sold the work as completed to the company. There is no reason whatever why such charge for his personal service should not enter into the legitimate and proper cost of the work. The same may be said of the charge for the services of DuBois. He was employed by Mullins to do certain necessary work in connection with the extension, and Mullins had the perfect legal right to include the amount due DuBois for such services as a part of the cost of the extension. There is no claim made that the amount of either item is excessive, in case it was proper to make the charge and include it in the alleged cost of the work. The same can be said of the charge for interest on the $65,000. It is, in any event, and in regard to all these items, a mere means of arriving at a fact, viz.: the actual cost of the work, for the purpose of seeing hereafter what kind of a bargain was made by the company defendant in its purchase. The question is, do these items legitimately enter into the cost of the work and so form a part of its value? On that question, it seems to me, there can be no doubt.

In arriving at an answer to the other proposition, as to the fair value to the company of the property purchased, or in other words in coming to a conclusion as to what kind of a bargain was obtained for the company by this purchase, it is proper to scrutinize the evidence going to show the value of the completed work, and for that purpose, the various items given by Mullins may be examined. We arrive at the conclusion that the items already criticised were properly included as a part of the actual cost of the work to the contractor, and that he was fully justified in treating with the company and the company with him on the basis of the actual cost of the work being $69,055.79. This of course gives not a penny of profit to the contractor, so far as Mullins was concerned. In regard to his holding an official position in the company, he had the same right to demand a profit on his work, when he subsequently sold it to the corporation defendant, that he had to charge for his personal services as a part of the cost of the work, as he did not do the work as agent for the company, or oversee it in his capacity of trustee or director thereof, but on the contrary, as he did the work for himself wholly and at his own risk, his position in the company, up to the time of the actual sale to it, had no effect upon his work on the extension, or his right to realize a profit thereon. Of course when he came to sell it to the company, if the sale were made by him as vendor to the directors, he being one of them and acting as such, the sale was a voidable one, liable to be set aside at the suit of the company and possibly at the suit of a shareholder. But we have seen that this was not the way in which the sale was made. Mullins did not act in his capacity of director at any meeting of the board, but he voted as a shareholder to make the purchase, at a meeting of the shareholders under the circumstances already mentioned. Profits upon the work were, therefore, a proper item to be considered when looking at the question as to what kind of a bargain the company defendant really made. Upon this subject there is no dispute if profits are to be allowed at all. Doing this work where there is risk arising from the necessary

laying of the pipes under water, a contractor would want the equivalent of $80,000 to $85,000 in cash. In this amount from ten to fifteen per cent would be estimated for profit, but it might be only five and it might be nothing. The work of putting pipe in swamp and salt meadow, as shown by the witnesses for plaintiff, was very doubtful as to its ultimate cost. It might greatly exceed even an intelligent estimate.

While showing the actual prices paid for some of the material, it was proved by Mullins when called as a witness by the plaintiff, that he had obtained about 600 tons of eight and four-inch cast-iron pipe in January, but when he came to use it in April the price had gone up about $4 per ton, which would enhance the actual cost of the work, if thus charged, some $2,400. In making up the account of the value of such work, a fortunate purchase of a part of the material used in its construction is proper to be taken into consideration.

It is plain that the court in finding that the work as completed was not worth more than $65,000, failed to take into consideration many items entering into the actual cost of the work, and upon the assumption of such actual cost, the court below chiefly based its finding of the completed value of the work. In truth all the items already mentioned should have been included. When viewing the completed work and in endeavoring to place some value upon it, we are not to be confined to the mere cost of material and the value of the labor contained in and expended upon it. A fair profit to the contractor is to be included, and the inquiry should be what under all the circumstances is the fair value of the property to the company considering its proposed use by it, and the general purpose for which the company is organized. This seems to be the rule derived from the cases of *Schenck* v. *Andrews* (57 N. Y. 142); *Boynton* v. *Andrews* (63 id. 94); *L. S. I. Co.* v. *Drexel* (90 id. 87), in which the suits were brought by creditors of the corporations. Looking at the case in this light it can be said that from the uncontradicted evidence it clearly appears that the cost of the completed work to the contractor (including his fair profit) was at least

$80,000 or $85,000. The trial court in finding to the contrary, made a finding which is wholly unsupported by the evidence. The finding proceeds upon a wrong theory, and is arrived at by excluding from the computation items which should properly have been considered. But this is the mere value to the contractor, while the true question is what is the value to the company?

In answering that question the trial court should take some other and additional facts into consideration.

It must be remembered, that the defendant corporation was organized for the purpose of supplying water to villages within the town of Hempstead. The evidence shows that it had completed its works so as to supply the village of Far Rockaway, within such town. Rockaway Beach was another village in the same town, about seven miles distant. It was one of the villages included in the charter powers of the defendant company, and it may, therefore, be said to have been within the contemplation of the members of the company to supply such village with water. The company finds this extension ready made to its hands, with pipes laid, risks successfully encountered, and all work done, so that nothing is wanting but the purchase and taking possession of the property, in order to at once enter upon the work of supplying this village with water, which is, as I have said, one of the purposes for which the company was organized. The question which at once confronts the company is, would it be good policy to refuse to purchase at the price named ($110,000), with not only the possible, but the very probable contingency of seeing a portion of its own legitimate field of operations occupied by some rival, either to its entire exclusion, or else under circumstances where it would be obliged to compete for business? It might be that the company could well afford to pay such price, considering the prospective profits to be derived from supplying the village with water, and the driving out of any competition with it in such work. Any court considering all these facts, and taking all the circumstances into consideration, might reasonably come to the conclusion

that the value of this property to the company defendant was the sum of $110,000.

The court below has not passed upon this question after taking all these matters into consideration, and if after doing so it should find the value of the property to the company was the last-named sum, then of course all basis for maintaining this action would be at an end.

But if after a critical examination of the facts the court should find the value of the property at the time of the proposed purchase to have been but $80,000 or $85,000, the vote to pay the sum above stated in stock and bonds, is not to be condemned as a fraud, unless the majority acted in bad faith. Possible or probable prospective value of property thus ordered to be purchased at a shareholders' meeting, may be taken into consideration upon this question of fraud, and actual good faith in the majority shareholders might be decided, among other things, by a consideration of the reasonableness, or the reverse, of such expectations of future value.

This is not the case of a creditor seeking satisfaction from a shareholder because of the unlawful issue of stock under the provisions of the manufacturing statute, such as the cases above cited were, and in order that the minority shareholders should be able to successfully attack the action of the majority in such a case as this, something more must be shown than that the property purchased was not of the full value of the stock or bonds issued at par in payment therefor. A discrepancy as large as that between $80,000 or $85,000 and $110,000, is not necessarily a fraud. The court would have to find the further facts already stated in this opinion as necessary to exist, before such action should be enjoined.

From these views it may be that no question will arise upon another trial as to the power of the company to issue its stock or bonds at less than par. It might be, however, that the findings of the court upon the questions of value would be such as to necessitate the decision of that question, and we think it proper, therefore, to state the conclusion to which its examination has brought us.

We think that, under the Manufacturing Act, the company cannot issue its stock as full-paid at anything less than its par value. The act makes special provision for the exercise of the power to issue stock in payment for property purchased by the company. Whatever the right of a corporation under the general powers pertaining to it as a corporation might be, we must look at the provisions of the statute where it specifically grants such power to find the terms and conditions upon which it is to be exercised. By section 2 of chapter 40 of the Laws of 1848 the trustees of a manufacturing corporation, founded under the act, are empowered to purchase property necessary for their business, and to issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be declared and taken to be full-paid stock, and not liable to any further calls. We think this language must mean that the amount of the nominal or par value of the stock must be put against the value of the property purchased. Otherwise we should have such a case as $100 in cash purchasing $100 of stock at par, under a subscription to the capital stock of the company, while the same $100, if first turned into property to be sold to the company, might purchase double the quantity of the stock, if the stock were only of the actual value of fifty per centum of its par value. The stock would issue only at its actual value in return for property, but in return for cash, it could only issue at its par value. In other words, if the stock were really worth but fifty per cent of its par value, actual cash would purchase only half as much stock as could be purchased with an equal value in property. This was never meant. And I think the expression that the stock thus issued for property purchased is to be taken as full paid-up stock, and that it is to be issued to the amount of the property purchased, must mean that it is to be issued at its par value.

It may be said that this construction prevents a corporation from purchasing property and paying for it with its stock, where actual value of the stock is enough below its par value to make the difference in a large purchase very appreciable.

That may be so.   But it was undoubtedly the object of the statute to make the full-paid stock that is issued the representative, dollar for dollar, of the money or property that has been paid in for its purchase, so that the company would start off in business with money or property of the full value of its paid-up capital.

The learned counsel for the appellant cites the case of *Van Cott* v. *Van Brunt* (82 N. Y. 535) as conclusive upon the point under discussion.   But we do not agree to that statement. The *Van Cott* case related to a railroad corporation which was organized under a statute, which does not contain this provision as to purchasing property.   It was decided that it had the right under the general powers of a corporation to procure the building of its road and pay for the construction of the same by the issuing of stock and bonds, and that it might issue such stock at its actual value, even though it were less than its par value.   But, where the provision as to the purchase of property is expressly stated, and the condition mentioned, a fair construction must be given such language, even though it curtail the power of a corporation as to the issuing of its stock.   The provision in the General Railroad Act (Chap. 282, § 16, Laws of 1854) making each stockholder " individually liable to the creditors of such company  *  *  * until the whole amount of the capital stock, so held by him, shall have been paid to the company," is not as we think the equivalent of the language used in the Manufacturing Act, and hence stock in a railroad corporation may be regarded as full-paid, when issued at its actual value in payment for the building or equipping of the railroad.

The language is used in reference to the liability of stockholders, and the section is silent upon what shall be regarded as paid-up stock, while the section of the Manufacturing Act clearly contemplates, as it seems to us, that only the amount of the stock, as named in the scrip, is to be issued to the amount of the value of the property, and is then to be regarded as full-paid stock.

A different rule, however, prevails in regard to the bonds

of a corporation. An extended discussion of the question is not needful. We think a corporation has the power to issue its bonds at less than par. So far as this point is concerned, it is not restricted to an issue only upon payment to the company of the par value of the bonds either in money or property for its use. The case of *Duncomb* v. *N. Y. H. & N. R. R. Co.* (84 N. Y. 203) does not hold any principle to the contrary. It was there decided that the bonds given the director, as a mere bonus on his subscribing to the stock, were without consideration, and the director, as a trustee of the company, had no right to receive them, and, therefore, in his hands, they were void.

The principle decided in *Curtis* v. *Leavitt* (15 N. Y. 1) gives validity to bonds thus issued. The repeal of the Statute of Usury, so far as regards corporations, operates to give validity to bonds negotiated at less than par. The case of *Ellsworth* v. *S. L., A. & T. H. R. R. Co.* (98 N. Y. 553) also impliedly holds that bonds thus issued are valid.

But the court might hereafter possibly find these facts, viz.: that the company, at a meeting of shareholders, resolved to purchase property of the value of but $80,000, and to pay for it by the issuing of stock of the par value of $50,000, and bonds of the par value of $60,000. Holding, as we do, that the stock must be issued at par, in order to pay only the balance of $30,000 of the purchase-price, the $60,000 of bonds would be issued at fifty per cent only of their par value, while it may be assumed that their actual value was ninety-five per cent thereof. Would the issue of such an amount of bonds under such circumstances, be enjoined as a fraud upon the minority? Considering the fact that the stock must be issued at par, the company must, therefore, receive in money or property the equivalent of its face or par value, and, unless it does so receive it, the issue is illegal. Under these circumstances the issue of almost twice the number of bonds, taken at their actual value, necessary to pay the balance due on the property purchased, such issue being made in fact because the stock was really worth not more than forty per cent of its par value,

would be, as it seems to me, a mere evasion of the statute as to issuing stock at par, and ought not be tolerated any more than any other evasion of a statute, no matter for what purpose such evasion was attempted If the facts assumed were to be hereafter really found, the issue of the bonds should then be enjoined.

The plaintiff's counsel makes the point that the company defendant was not authorized to issue its bonds for the purpose mentioned. It is authorized by section 5 of the act under which it was organized, as amended by chapter 213 of the Laws of 1881, to borrow money for the purpose of constructing its works, and to issue bonds for its payment. It is altogether too narrow a construction of the statute to hold that the corporation must itself construct the works, and may not purchase works already constructed, and fit and suitable for its purposes. Nor do we think that in purchasing property the corporation, if it intend to issue stock in payment, must make the whole payment in stock. It may issue stock for a portion, and may pay in cash or issue bonds for the balance.

From these views it results that the judgment in this action should be reversed and a new trial ordered, costs to abide the event.

All concur.

Judgment reversed. _____