JAMES W. HINE, Suing for Himself and Other Stockholders Similarly Situated, Plaintiff, *v.* WILLIAM H. LAUSTERER, as Executor, etc., of WILLIAM J. LAUSTERER, Deceased, and Others, Defendants.*

Supreme Court, Chautauqua County, January 7, 1930.

*Frederick P. Kimball [Charles Van Voorhees, Leslie Briggs, Frank Keeper* and *Frank H. Mott* of counsel], for the plaintiff.

*John S. Leonard [Harold J. Adams* and *Charles F. Blair* of counsel], for the defendants.

CHARLES B. WHEELER, Official Referee. The plaintiff by this action seeks to charge the estate of William J. Lausterer and others

*See, also, 135 Misc. 655.

and to make them account for certain alleged profits realized from the purchase by the Automatic Registering Machine Company of some 550 voting machines from the Empire Voting Machine Company, of which he was a director.

It becomes necessary to detail somewhat at length the history of the transactions out of which this litigation arises. The Empire Voting Machine Company as a corporation was engaged in the manufacture and sale of voting machines. Lausterer was a stockholder and one of the directors of that company. In 1913 it made a contract with the city of Chicago to manufacture and sell to that city 1,000 voting machines, and entered upon the performance of that contract. It made 750 machines for the purpose of fulfilling the agreement, and actually delivered 200 of the number, which the city paid for. After this had been done the city of Chicago repudiated its contract with the Empire Company, and refused to pay for further deliveries. In addition to the 200 machines paid for, 300 other machines had been shipped to Chicago. A litigation followed. The Empire Company sued the city to recover. The city defended on the ground that certain legal formalities required by its charter leading to the making of the contract had not been complied with. The action was tried, and the courts held the defense interposed by the city good, and the contract void. An appeal was taken from the judgment of the court and, on that appeal, the judgment of the lower court was affirmed. As a result the Empire Company was left with 550 voting machines on its hands, 300 in storage at Chicago and 250 at Jamestown, N. Y., the place of manufacture.

The voting machines were of a special type, very large, known as a seventy-key machine and designed for cumulative voting, such as prevailed in the city of Chicago. They were not suited for use in other voting localities or municipalities. They could not be sold to other municipalities. Efforts were made to dispose of these machines but no purchasers could be had. The evidence shows that the city of Chicago endeavored to sell the 200 machines for which it had paid. It advertised the machines, and wrote letters to the public authorities of most of the principal cities of the country in an effort to sell and dispose of them. It did sell three or four of these machines to some labor unions.

It had all the rest of the machines on hand and was unable to sell them. This was owing to the fact that the machines were of a special type and design, wholly unsuited to the requirements of other cities and municipalities desiring to adopt the system of voting by machines. In short the machines in question were practically junk as they stood. It was thought these machines

might be disassembled and the parts used in reconstructing smaller machines to meet the public demand, but the Empire Company had gone out of business. It was without assets or other property except these machines it had on hand. It had parted with its plant and had no means of resuming operations. Storage charges were mounting up. After paying most of its debts, it still owed the banks upwards of $20,000, with nothing to pay this indebtedness except what it could realize from the machines in question. The problem before it was what it was best to do in view of the situation.

Mr. Lausterer was the president and principal stockholder in the Automatic Registering Machine Company, which was also engaged in the manufacture and sale of voting machines. Mr. Lausterer was approached by his associate directors of the Empire Company and asked to buy the machines in question. He stated to them he did not wish to purchase.

The evidence is that Mr. Lausterer consulted the superintendent of the Automatic Registering Machine Company as to the advisability of purchasing the machines, and whether they could be used in constructing new machines, and that his superintendent advised him that in his judgment new machines could be made cheaper than could machines be made by utilizing parts of the machines made for Chicago.

However, it appears that in the end Mr. Lausterer did make an offer to the Empire Company to take the machines, and as the purchase price to pay the outstanding indebtedness of the company. In making this offer Mr. Lausterer was undoubtedly making it not for himself but on behalf of the Automatic Registering Machine Company.

The board of directors of the Empire Company held a meeting at which Mr. Lausterer was present, and passed a resolution to accept the offer made, all voting in favor of such acceptance, and the machines were turned over to the Automatic Registering Company, and the indebtedness of the Empire Company was paid as agreed, and the sum of $20,296.67 was thus paid by the Automatic Company for the voting machines on hand. When we state the offer to buy was made by Mr. Lausterer it must be understood the offer was made by him for and on behalf of the Automatic Company for whom he acted.

After getting the voting machines in question the Automatic Company proceeded to dismantle and take them apart. It involved dismantling and taking apart a machine made up of over 20,000 pieces.

These reconstructed voting machines were finally worked off to purchasers. As a result of such operations it appears that the

Automatic Company did in fact make a saving by utilizing such old parts of about $156 a machine.

The plaintiff in this action asks to have the sale in question declared illegal and void, and that the estate of Mr. Lausterer account for and pay over the profits realized for the benefit of himself and other stockholders of the Empire Voting Machine Company on the theory that being a director of that company he and the Automatic Company had no legal right to become the purchaser of such machines, owing to the trust relation he sustained to the Empire Voting Machine Company. The plaintiff alleges fraud, conspiracy and bad faith on the part of Mr. Lausterer.

The referee, however, is unable to find in the evidence anything to justify any such claim.

On the contrary, we are of the opinion that the evidence shows that whatever was done by Mr. Lausterer or by the Automatic Company was in fact done in the utmost good faith, and with no purpose to defraud or take any unfair advantage of the Empire Voting Machine Company, or of its stockholders. The voting machines were practically worthless as they stood. They were unsalable. Efforts to dispose of them were unavailing. Mr. Lausterer was reluctant to buy. He was urged to do so, and told his associates on the Empire board that he did not wish to purchase. He was advised by the superintendent in his factory that new machines could be built cheaper than to attempt to use the old parts. Anyway it is apparent that the result of an attempt to do this was very problematical as to the outcome. It had not been done before, and there was no guide from practice and actual experiment to know just how such an operation would result. Whoever undertook it ran chances of a loss rather than a profit. Nevertheless it seems that it was seen fit to make the experiment and the offer in question was made, influenced probably in part with the desire to take care of and pay off the outstanding obligations of the Empire Company. Mr. Lausterer is dead and cannot be heard in his own behalf as to all the considerations entering into his own mind which induced the transaction. Nevertheless, the board of directors were free to act as they deemed best for the interests of the company. They knew the situation, and they were unanimously in favor of selling on the terms offered. There is no pretense that they were in any way misled or deceived by Lausterer or by any one else. It was all above board. No one can charge that they or any of them acted in bad faith, or differently from what they thought for the best interest of the company they represented. If we suppose that, instead of making the sale, the board had voted to reject the offer, where would they have been to-day? The company would have had these

voting machines on hand with all storage charges to meet, besides the indebtedness which has now been paid and discharged.

When the referee reviews all the facts and circumstances, the referee can reach no other conclusion than that the whole transaction and the purchase of the voting machines was in fact made in perfect good faith, and free from any taint of unfairness or fraud, and we so find as matter of fact.

The only question then remaining is whether the fact that Mr. Lausterer was a director and trustee of the Empire Voting Machine Company when he made the purchase of these machines for the Automatic Company renders the transaction so illegal as a matter of law as to entitle the plaintiff to succeed in this action. To that proposition the referee will address himself.

Upon the foregoing statement of facts the question of law presented for disposition by the referee is whether the estate of William Lausterer shall be held to account for any profits realized by the Automatic Registering Machine Company by reason of the sale to it of the 550 voting machines in question. For the purposes of the argument we will assume that the sale was made to Lausterer personally although as matter of fact it was to the Automatic Registering Machine Company, of which Lausterer was the president and principal stockholder.

If any recovery is to be had it must under the facts be predicated on the contention of the plaintiff that as matter of law by reason of the fact that Lausterer was a director of the Empire Voting Machine Company and bound to account for any profits realized out of the purchase of such machines, no matter in what good faith the sale and purchase was made, for the referee finds as matter of fact that the transaction was had in perfect good faith both on the part of Lausterer and the directors of the Empire Voting Machine Company.

The referee does not understand that the rule of law goes to the extent of absolutely condemning dealings between a corporation and its directors and officers. Whether a transaction between a corporation and an officer or director will be condemned and set aside depends on the circumstances of each particular case.

We believe the general rule governing such cases to be carefully and accurately stated in Corpus Juris (Vol. 14a, § 1880), where it is said: " A purchase by an officer or director of property from the corporation is not void, but is voidable at the option of the corporation. The courts will refuse to set it aside on proper application when, and only when, it was fairly and openly made for an adequate consideration and the corporation was adequately represented by other officers or directors. The presumption is

against the validity of the purchase and when it is challenged, the purchasing director or officer has the burden of defending it and of showing its fairness affirmatively." (Citing many cases in the courts of various States.)

Morawetz on Private Corporations (at § 527) says: "There is no necessary impropriety in a contract between a director and the corporation, if the latter is represented by other agents. * * * To prohibit the directors, in all cases, from dealing with the corporation, would often deprive the latter, in time of need, of the assistance of those persons who have the greatest interest in its welfare, and who are willing to give their aid upon the most reasonable terms."

As was said by Judge CHASE in his opinion in the case of *Billings* v. *Shaw* (209 N. Y. 265, at p. 280): "If a profit is made in a transaction that is honest in itself, and is open and fully disclosed, and the transaction is consummated after an honest statement of the facts to the board of directors at a meeting and to the stockholders at a stockholders' meeting, there is no reason for criticism or for charging such director with any profit he may make." (See, also, *Continental Securities Co.* v. *Belmont*, 83 Misc. 340.)

Applying the general rules laid down in cases of this character to the circumstances of this case, we are of the opinion that the evidence does not justify holding the estate of Mr. Lausterer to account for the sale to the Automatic Registering Corporation of the 550 voting machines in question.

In the first place the sale was "*fairly and openly made.*"

The Empire Voting Machine Company had these machines on hand. They had had them practically since 1913, when they made the contract with the city of Chicago. The sale to the Automatic Company was made on May 21, 1920. The Empire Voting Machine Company had gone out of the business of manufacturing voting machines. It had sold and transferred its plant to the Triumph Voting Machine Company. The unfortunate contract with the city of Chicago and the repudiation of that contract had left the Empire Voting Machine Company so crippled that it could no longer continue business. It was left with an indebtedness of some $22,000 and had no property or assets with which to pay this indebtedness except such as might be realized out of the 550 voting machines left on its hands.

It was incumbent on the company and its directors to dispose of these machines on the best terms obtainable. But these machines were of such a peculiar type and design that they were not wanted by other voting districts. They were unsalable. Efforts were made to sell without results. The voting machines for all practical

purposes were little more than junk. The directors of the Empire Voting Machine Company thoroughly understood these things. They, or at least most of them, had been connected with the voting machine business for years, and knew the hopelessness of getting purchasers for these rejected machines.

Mr. Lausterer was not seeking to purchase these machines. He, on the other hand, was importuned by his associate directors to take them, and when so urged had informed them that he did not wish to buy. He had good reasons for not wishing to buy. The evidence is he had consulted with his factory superintendent as to the advisability of buying the machines or taking them apart, using the old parts so far as possible, and constructing new and salable voting machines, and that his superintendent had advised against it, telling him that in his opinion new machines could be built cheaper than by utilizing old parts, which necessitated taking down and dismantling the old machines and cutting down the parts to make them suited for new machines.

Nevertheless it appears that Mr. Lausterer, on behalf of the Automatic Registering Machine Corporation, did make an offer to take these 550 machines, and to pay off and discharge the outstanding indebtedness of the Empire Voting Machine Company, amounting to about $22,000. This offer was accepted by the board of directors of the Empire Voting Machine Company at a meeting of the board held on May 21, 1920.

The minutes of that meeting show a report was then made of the condition of the affairs of the company, and a resolution was unanimously passed to accept the offer made.

There is not a suggestion in the evidence but that the action taken and contract made for the sale of the machines was not "*fairly and openly made*," or that any one was actuated by any corrupt or improper motives in doing what was done, or that any unfair advantage was taken or attempted by any one. There was no concealment. Although Mr. Lausterer is dead and cannot speak for himself, the evidence leaves a strong impression on the referee's mind that what he did was largely prompted by a desire to aid and assist the Empire Voting Machine Company out of its difficulties and to provide means for the payment of its debts.

*Second.* We believe too that the price paid was "*adequate*" in view of all the circumstances. The Automatic Registering Machine Corporation paid about $22,000 for the machines bought, which made the cost to it of about $40 a machine. The evidence is that these machines were of a special design built for the city of Chicago. They were unusually large, being built for some seventy positions, and had a special cumulative voting device. No

other voting municipality could or would use them. They were wanted by no one, and were unsalable to any city or voting district. The city of Chicago has nearly all of the 200 machines it paid for still on hand. It has made special effort to sell and dispose of these 200 machines. It has offered them for sale at public auction. It has written the officials of the principal cities of the country offering them for sale, and has been unable to procure any buyer. They are worth nothing to any one except to sell as junk.

The only possible use they could be put to was to dismantle the machines and to use such old parts as possible in building new machines. This involved taking old parts and cutting them down, and a general process of reconstruction. It involved making new dies and other devices to do the work, and a disorganization of the factory where the work was carried on.

This had never been done before. It was the first experiment of the kind. No one could tell in advance just what the cost would be. Experienced engineers and mechanics testified that such rebuilding of old machines into new rarely resulted in any saving. Mr. Lausterer had been advised by his master mechanic and superintendent that in his judgment entirely new machines could be built as cheaply as to utilize old parts in so doing.

The financial success of an effort to do so was entirely speculative, and it necessarily followed that in determining the value of such used machines as they stood the buyer would have to take into consideration all the circumstances and possibilities.

The referee, therefore, finds that the price paid was " adequate " and fair, all things considered. It is true, as the venture ultimately resulted, the Automatic Registering Machine Company made a profit out of the operation. That the venture resulted in a profit rather than a loss in the final outcome is not the test as to whether the price paid was a fair price, but is to be determined by the circumstances and prospects at the time the sale was made. When so tested the referee is of the opinion the price agreed to be paid and paid was adequate and fair and the transaction between the buyer and seller is not subject to just criticism of being inadequate and unfair.

It seems to us that the board of directors of the Empire Voting Machine Company would have been very derelict in their duty to the creditors and stockholders of the company had they voted to reject the offer made. They would beyond question have been left just where the city of Chicago is to-day with all the old machines on hand and the company's debts unpaid.

*Third.* The company was adequately represented by the officers

and directors in making the sale of the 650 voting machines to the Automatic Registering Machine Company. The offer to buy was formally accepted.

The minutes of the meeting of May twenty-first show all the directors of the Empire Company were present, and that they unanimously voted to accept the offer made to buy. It did not depend on the vote of Mr. Lausterer to carry the resolution. Had he been absent from the meeting or refused to vote the resolution would have been carried all the same.

As we have already stated, these directors were not inexperienced men ignorant of the conditions, but men who had experience in the manufacture and sale of voting machines for years, and quite able to judge for themselves whether the sale was fair and advantageous for the company. Consequently the referee finds as matter of fact that the Empire Company was "*adequately represented by other officers or directors*" in making the sale attacked.

These facts in the referee's opinion lead to the dismissal of the plaintiff's complaint. Nevertheless we think the case merits some further consideration of the decisions and law bearing on the questions involved.

A director of a corporation occupies a certain trust relation to the company and to its stockholders. He is not on that account forbidden to have business transactions with the company for which he is a director.

Such transactions are not as matter of law void, but only voidable in a proper case.

Courts will scrutinize such transactions, however, with care, and where such transactions are attacked and sought to be set aside the burden rests on the director or officer of the company to show his dealings were open and fair and free from fraud or unfair advantage.

The corporation is not forbidden to deal with one of its directors or officers. Neither is it forbidden to sell property to them or such director or officer forbidden to purchase.

The rule seems to be well and concisely stated in 14 Corpus Juris, section 1880, where it is said that courts will refuse to set aside a sale to an officer when "fairly and openly made for an adequate consideration, and the corporation was adequately represented by other officers or directors." (Citing many decisions of various States, and stating the general consensus of judicial opinion.)

Morawetz in his work on Private Corporations (§ 521) states: " A director or other agent of a corporation may deal with the company provided it be adequately represented by other agents." (See, also, § 527 and cases cited; *Duncomb* v. *N. Y. & N. H. R. R. Co.*, 88 N. Y. 1.)

In the case of *Continental Securities Co. v. Belmont* (83 Misc. 340; affd., 222 N. Y. 673) the trial court said, quoting verbatim from *Billings v. Shaw* (209 N. Y. 265, 280): "The illegality of a profit made by a director arises almost wholly by reason of some undisclosed and secret bias on his part against the interest of the corporation of which he is a director. If a profit is made in a transaction that is honest in itself and is open and fully disclosed, and the transaction is consummated after an honest statement of the facts to the board of directors and to the stockholders, there is no reason for criticism or for charging such director with any profits that he may make."

As the referee has already stated, the sale of the voting machines to the Automatic Company was open and fair, and free from any overreaching or concealment.

The directors of the Empire Company fully understood the entire situation. They were men with years of experience in the manufacture and sale of voting machines and believed the disposition of these machines to the Automatic Company for the best interest of the Empire Company.

The plaintiff in this action relies principally on the case of *Munson v. R. R. Co.* (103 N. Y. 58).

In that case, plaintiffs sought to compel the specific performance by the defendant corporation (of which the plaintiff Munson was a director) of a contract whereby he and his associates agreed to sell and the corporation to buy the property, rights of way, etc., of another railroad corporation which had been partially constructed at the time the contract was made. Title to this property acquired through a foreclosure proceeding by plaintiffs *was tendered to the defendant corporation which refused* to perform the agreement by delivery of the purchase price. The apparent reason for this refusal was that the defendant railroad corporation, after entering into this contract, decided to locate its line on different rights of way than those purchased from the plaintiffs. The proposition to be decided is thus stated by the court: "The plaintiffs therefore are compelled to meet the question, whether upon principles of equity they are entitled to the aid of the court *to enforce an executory contract* between themselves on the one side and the defendant corporation on the other, for the sale of the property of the former, and in a case where one of the plaintiffs at the time the contract was made, was a director of the purchasing corporation and took part in making the contract upon which the action is brought." (P. 71.)

The decision, taken in its most literal aspect, does not state that a *stockholder* could repudiate the contract, even in the absence of

fraud or collusion, but on the contrary states that the court " stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, *at the instance of the party whom the fiduciary undertook to represent,* without undertaking to deal with the question of abstract justice in the particular case; " and again that " *a corporation* in order to defeat a contract entered into by directors, in which one or more of them had a private interest, is not bound to show that the influence of the director or directors having the private interest, determined the action of the board; " and again that the law will not enter into the inquiry of the measure of influence of the trustee " in an action by the trustee in his private capacity, to *enforce the contract* in the making of which he participated; " and finally " we perceive no reason why, under the general rule, the corporation may not resist an action for specific performance, *at least in a case where it has not accepted the consideration and taken the benefit."* It needs only to be stated that an action to enforce an executory contract which is repudiated by the corporation presents a question different from one where the contract has been fully executed and the corporation does not seek to avoid. The opinion in the *Munson* case so indicates. In any event this distinction is clearly made in later cases where the *Munson* case is referred to and discussed.

Applying this rule to the facts and circumstances of this case we at once see that the equitable grounds to upset the sale to Mr. Lausterer do not exist. In the first place the consideration paid was fair and adequate.

The contract was fairly and openly made. The sale apparently was urged on the purchaser by his associate directors and was not sought by Lausterer. He was reluctant to buy.

The company was adequately represented by other directors, who voted for the sale. The acceptance of the proposition finally made did not depend on the vote of Lausterer. All his associate directors favored and voted for it. So in no proper sense can it be said the purchaser was dealing with himself.

In the *Munson* case the court refused a specific performance of a purely executory contract. In the present case the contract with the Automatic Company became an executed contract. The purchase price was paid and the Empire Company received the benefit.

The Empire Company has never repudiated the contract or sought to set aside the sale. In *Burden* v. *Burden* (159 N. Y. 287, 307), where a stockholder sought to enjoin the performance of a contract made by a corporation with another where the two corporations had directors in common it was found by the trial

court that the contract was not made in bad faith and an injunction was denied. In upholding the denial the Court of Appeals said: "The question of fraud, or bad faith, is thus removed from the case, and we are to consider whether plaintiff was entitled to the injunction prayed for by reason of the fact that James and Arts were directors in both companies.

"It is undoubtedly a well-settled rule of law that executory contracts entered into by corporations having common directors are voidable at the instance of either corporation, and the court will not inquire into the question whether or not it is beneficial to the corporation seeking to avoid it.

"This right is vested in the corporation and not in the individual stockholder.

"A stockholder cannot enjoin the execution of a contract *intra vires unless fraud is shown.*"

In *Strobel* v. *Brownell* (16 Misc. 657) the plaintiff as stockholder sought to cancel the contract made by a corporation with the defendant who was one of its directors. In dismissing the complaint the court (per RUMSEY, J). comments upon the case of *Munson* v. *Syracuse, etc., Railroad Co.* (103 N. Y. 58) which is so much stressed by the plaintiff herein and shows up the fallacy of the plaintiff's argument on this point as follows: "There is no rule of law which forbids the director of a corporation from making a contract with the company. It is true, the director stands in the corporation in a fiduciary situation, and he is bound under all circumstances, and at all times, to look to the interests of the company whose agent he is, and he is not at liberty at any time to put himself in any position by which he can make an undue or improper profit out of the corporation for his own benefit. But he may make a valid contract with it, provided that in doing so he deals fairly and honestly toward the stockholders who have appointed him their agent. *Barr* v. *Pittsburg Plate Glass Co.*, 17 U. S. App. 124, 141. Every such contract made by a director of a company with a corporation is looked at with suspicion, and if the transaction is attacked the burden is upon the agent of the corporation, who has contracted with it, to show that it was honest and fair in all its parts, and that he has made no more profit out of the contract than any other person might properly have made. *Gamble* v. *Queens County Water Co.*, 123 N. Y. 91. Such a contract is not void, but is only voidable at the suit of the corporation or of the stockholders, if the corporation refuses to sue, *when it shall be made to appear that the contract is one which the director ought not to have entered into.* Not being void, it necessarily is good until it has been set aside. *Barr* v. *N. Y., L. E. & W. Railroad Co.*, 125 N. Y. 263. *But it will*

*not necessarily be set aside unless, in view of all the circumstances, it appears that the contract is one which ought not to have been made, and by means of which the director who has entered into it has imposed upon the company,* or taken advantage of his position to get from the company a larger compensation than he ought, or a greater profit than should have been made for the work which was done. Such, I think is the fair result of the cases which have been cited above, and is the general concensus of authority on that subject. The leading case on the subject is *Twin-Lick Oil Company* v. *Marbury,* 91 U. S. 587. That was an action brought by the corporation against a director to set aside a sale of the property of the corporation upon a mortgage which had been given to the director for money loaned by him to the corporation. The charge was that the money was loaned at an improper rate of interest, and that the director took advantage of the necessity of the corporation to make the loan and obtain the security. The Supreme Court of the United States, after a careful examination, affirmed the judgment of the court below refusing to set aside the transaction, and holding the law to be substantially as stated above. The case of *Munson* v. *S., G. & C. Railroad Co.,* 103 N. Y. 58, is not applicable to the condition of affairs shown here. The question presented there, as appeared by the opinion of Judge ANDREWS, is whether the plaintiffs were entitled to the aid of the court to enforce an executory contract between themselves, on one side, and the defendant corporation on the other, for the sale of the property of the plaintiffs to the corporation, in a case where one of the plaintiffs, at the time the contract was made, was a director of the purchasing corporation, and took part in making the contract upon which the action was brought. It is said that in that case the plaintiff stood in the attitude of selling as owner, and purchasing as trustee, and the result of the case was simply that when that condition of affairs appeared the court would not examine into the advisability of the contract, but if the corporation objected to carrying it out the court would not lend its aid to a specific performance. It is not a case where the contract had been substantially carried into effect for it, or where the action was brought for the purpose of setting aside. In such a case the court is at liberty to look into the contract, and the circumstances under which it was made, and say whether it was a fair contract for the corporation, and one which, upon the whole, the director might properly enter into."

In *Polhemus* v. *Polhemus* (43 Misc. 141) a stockholder sought to set aside a sale of property to a corporation made by one of the directors. The court said: " It does not seem that the plaintiff can prevail, as no fraud or waste has been shown. The complaint

has not been made out on that head. The rule is that a sale by a trustee to his *cestui que* trust, and paid for out of the trust estate, the same as a purchase by him of trust property, or any personal dealing by him with such property, is voidable at the election of the *cestui que* trust, without regard to whether the transaction was beneficial or otherwise, or fraudulent; and it applies to trustees of corporations. (*Davoue* v. *Fanning*, 2 Johns. Ch. 253; *Dodge* v. *Stevens*, 94 N. Y. 209; *Gamble* v. *Queens Co. Water Co.*, 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527; *Sage* v. *Culver*, 147 N. Y. 241.)

" But these directors were not under a duty to avoid the purchase for the corporation unless it was fraudulent or wasteful, and the plaintiff introduced no evidence to show that there was fraud or that the price was excessive, but rested on the proposition that she as a shareholder has the right to elect to avoid the transaction and have it set aside without regard to its character. If the bargain was a fair one for the company, the directors had the right to stand to it. It was for them to elect, and not for the shareholders, much less for one shareholder. They were free to affirm the transaction, from which it must follow that a shareholder cannot set it aside by a suit without proving that it was fraudulent or wasteful. That is the foundation of a shareholder's right to interpose. If it was fraudulent or wasteful, it was a breach of trust to enter into it, and a suit by a shareholder would lie to undo it. The directors act for the corporation, and a shareholder has only a secondary right to interfere, and his interference must be based on fraud or waste by the directors, or on acts by them in excess of their powers. (*Hawes* v. *Oakland*, 104 U. S. 457.) I have been referred to no authority on this head, but in the opinion in the *Gamble Case, supra,* there is the following:

" ' Of course when he [a director] came to sell it to the company, if the sale were made by him as vendor to the directors, he being one of them, and acting as such, the sale was a voidable one, liable to be set aside at the suit of the company, and possibly at the suit of a shareholder.' This cautious statement in respect of a suit by a shareholder seems to have had reference to fraud or waste as the only basis for it. In a suit like this, the burden is not on the defendants to show that there was no fraud or waste."

In *Cowell* v. *McMillin* (177 Fed. 25) an individual stockholder sought to enjoin the execution of a contract made with the defendant who was the president and general manager of the company. In its opinion the court said: " We would not, to the slightest extent, depart from the salutary rule that directors and other officers of a corporation, occupying a fiduciary relation towards a corporation, are not permitted to assume positions which will bring their private

interests into conflict with their duties to act solely in the interests of their corporation; nor would we argue upon the wisdom as well as the morality of the doctrine that where a corporation has made a contract with one of its directors, or a contract wherein one of its directors is personally interested and the interested director has taken part in the making of the contract, the corporation may elect to avoid the agreement so made even though it is in fact free from fraud. But these principles are not those which control in the present case, for here the transaction, when viewed as a whole and in its several parts, between the director and his company, was entirely free from fraud, and the contract was unanimously authorized by a board of disinterested persons, the interested director not voting. Thus, the case is brought within the rule recognized by the Supreme Court of the United States, namely, that where the director has acted with that candor and fairness which equity imposes as the guide for dealing between him and the corporation, and the transaction is open and free from blame, the director is not forbidden from making a contract with the corporation, or from entering upon a transaction in which he is personally interested. *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587, 23 L. Ed. 328. See, also, Marshall on Corporations, § 377; *Figge* v. *Bergenthal*, 130 Wis. 594, 109 N. W. 581, 110 N. W. 798; *Barr* v. *Pittsburgh Plate Glass Co.*, 57 Fed. 86, 6 C. C. A. 260. And an individual stockholder cannot enjoin the execution of a contract *intra vires* unless fraud is shown. ' So long as the agents of a corporation act honestly within the powers conferred upon them by the charter, they cannot be controlled. The individual shareholders have no authority to dictate to the company's agents what policy they shall pursue or to impair that discretion which was conferred on them by the charter.' (Morawetz Corp. 243.) "

In *Sage* v. *Culver* (147 N. Y. 241, 247) the Court of Appeals said: " When a trustee or the officer or director of a corporation deals with himself as an individual or in the character of trustee, director or officer of another corporation, with respect to the funds, securities or property of the corporation, the transaction is *at least open to question by* the corporation, or, *in a proper case, by its stockholders,* and the trustee is bound to explain the transaction and show that the same was fair and that no undue advantage has been taken by him of his position for his own advantage or the advantage of some other corporation in which he has an interest.

" When it can fairly be gathered from all the allegations of a complaint that the officers and directors of a corporation have made use of relations of trust and confidence in order to secure or promote some selfish interest, *enough is then averred* to set a

court of equity in motion and to require an answer from the defendants in regard to the facts. When it appears that the trustee or officer has violated the moral obligation to refrain from placing himself in relations which ordinarily produce a conflict between self-interest and integrity, there is in equity a presumption against the transaction, which he is required to explain."

Undoubtedly the leading case as bearing on the questions now under consideration, at least in the United States courts, is that decided by the Supreme Court in *Twin-Lick Oil Company* v. *Marbury* (91 U. S. 587).

In that case the corporation was engaged in the production of petroleum oil. It became embarrassed and borrowed from one of its directors $2,000 which it secured by a deed of trust. The property was sold under the deed, and bought in by him on such sale. The action was brought to set aside the sale and it was charged the defendant's purchase was absolutely void owing to his fiduciary relations with the company. The court found as matter of fact that the money was advanced in good faith and that there was neither actual fraud nor advantage taken by the director of his position as director.

The question presented was whether the purchase was absolutely void. " While it is true that the defendant, as a director of the corporation, was bound by all those rules of conscientious fairness which courts of equity have imposed as the guides for dealing in such cases, it cannot be maintained that any rule forbids one director among several from loaning money to the corporation when the money is needed, and the transaction is open, and otherwise free from blame. No adjudged case has gone so far as this. Such a doctrine, while it would afford little protection to the corporation against actual fraud or oppression, would deprive it of the aid of those most interested in giving aid judiciously and best qualified to judge of the necessity of that aid, and of the extent to which it may safely be given."

It is to be noted that this action brought by the plaintiff is one where he sues as an individual stockholder. The stockholders of the Empire Company have taken no action as such to disaffirm the transaction. The plaintiff is so far as appears acting for himself. The cases above quoted seem to hold that an individual minority stockholder has no standing to set aside corporate acts made by the directors, where such acts are not touched with fraud, and are made in perfect good faith, and such is this case. There is another consideration which militates against the maintenance of this action.

In the case of *Twin Lick Oil Co.* v. *Marbury* (91 U. S. 587) it is said that the " doctrine is well settled, that the option to avoid

a sale must be exercised within a reasonable time " (p. 591) and that " what constitutes a reasonable time in any particular case must be arrived at by a consideration of all its elements which affect that question."

The sale in question was made May 21, 1920. So far as the evidence discloses, the plaintiff here raised no objection to the sale until August, 1923, when he wrote one of the directors of the Empire Company. He apparently remained silent until he learned that the Automatic Registering Machine Corporation had made a profit in using the old parts of the dismantled machines. He waited and permitted the agreement between it and the Empire Company to be consummated, and the Empire Company to receive the benefits of the transaction. If he wished to attack and question the validity of the sale, good faith required that he should have acted sooner, and the referee is impressed with the thought that he failed to act within a reasonable time. The referee, therefore, reaches the conclusion that in the absence of fraud or unfair advantage the sale of the voting machines in question to the Automatic Machine Company cannot and ought not to be set aside.

The complaint is dismissed, with costs.