Franz Merz, Suing on Behalf of Himself and Other Stockholders of the Interior Conduit and Insulation Company Similarly Situated, etc., Appellant and Respondent, *v.* Interior Conduit and Insulation Company and Others, Respondents and Appellants.

*Corporation — issue of bonds to pay a scrip dividend, forbidden — bonds cannot be issued merely to reduce the capital stock — Laws of 1892, chap. 688, §§ 23, 42.*

Under section 23 of the Stock Corporation Law (Chap. 688 of the Laws of 1892), providing that the directors of a stock corporation shall not make dividends except from the surplus profits arising from the business of the corporation, nor divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital of the corporation, or reduce its capital stock except as authorized by law, a corporation has no authority to make a scrip dividend in one year and in the succeeding year issue bonds to pay such dividend. Section 42 of the Stock Corporation Law forbids the issue of bonds by a corporation to reduce its capital stock or to pay scrip dividends.

O'Brien, J., dissenting.

Appeal by the plaintiff, Franz Merz, suing on behalf of himself and other stockholders of the Interior Conduit and Insulation Company similarly situated, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 5th day of April, 1895, denying his motion for an order continuing an injunction heretofore granted,

enjoining and restraining the defendants during the pendency of the above-entitled action from issuing certain so-called gold debenture bonds.

Also an appeal by the defendants, the Interior Conduit and Insulation Company and others, from so much of the said order, entered in said clerk's office on the 5th day of April, 1895, as orders and directs that the injunction heretofore granted in the above-entitled action be continued to the extent that the plaintiff shall not be called upon to surrender any part of his stock for retirement or to subscribe for the debenture bonds unless he so desires.

*A. J. Dittenhoefer* and *David Gerber*, for plaintiff.

*Eugene H. Lewis*, for defendants.

FOLLETT, J.:

Stripped of unnecessary words the scheme of the corporation is to issue $500,000 of its bonds, payable in gold coin April 1, 1925, with interest at six per cent per annum, payable on the first days of April and October in each year, which are to be issued, not "for money, labor done or property actually received for the use and lawful purposes of such corporation," but for the following purposes:

| | |
|---|---:|
| Twelve and one-half per cent of the bonds to be devoted to paying scrip............................... | $62,500 |
| Fifty per cent of bonds to reduction of stock of corporation........................................ | 250,000 |
| Thirty-seven and one-half per cent of bonds for cash.... | 187,500 |
| | $500,000 |

In June, 1894, the directors of the corporation declared a scrip dividend of five per cent on its capital stock of $1,250,000, the total amount of which dividend was $62,500. At the same time it declared a scrip dividend of five per cent on $500,000 on capital stock not then issued, but which it is alleged ought to have been issued to the Johnson Standardizing Company. This scrip, amounting to $12,500, was turned over to the latter company. The total amount of dividend scrip outstanding is $75,000, besides interest, $62,500 of which is to be paid by exchanging it for the bonds to be issued.

Section 23 of the Stock Corporation Law provides : " The-directors of a stock corporation shall not make dividends, except from the surplus profits arising from the business of such corporation ; nor divide, withdraw or in any way pay to the stockholders, or any of them, any part of the capital of such corporation, or reduce its capital stock, except as authorized by law." (Laws of 1892, chap. 688.)

There is no authority for making a scrip dividend in one year, and in the succeeding year issuing bonds to pay such dividend in whole or in part. This seems to me to be a plain violation of the statute. If this is sanctioned the entire capital stock of a corporation can be wiped out by the declaration of dividends and subsequently issuing bonds wherewith to pay the dividends.

I fail to find any provision in the statute authorizing the capital stock of the corporation to be reduced by the substitution of bonds therefor. The 42d section of the Stock Corporation Law provides : " No corporation shall issue either stock or bonds except for money, labor done, or property actually received for the use and lawful purposes of such corporation. No such stock shall be issued for less than its par value. No such bonds shall be issued for less than the fair market value thereof." Under this section the corporation cannot issue bonds to pay scrip dividends or for the purpose of reducing its capital stock.

This is in no sense a scheme for the reduction of the capital stock of the corporation, and for a division among the shareholders of the property of the corporation in excess of the amount of the capital stock as reduced, and the cases sanctioning such reductions and distributions are not in point.

Whether the proposed scheme will advance the interests of the corporation or not is a question with which we have nothing to do. The statute prescribes the purposes for which stock and bonds may be issued, and every stockholder has the right to compel the directors to observe the statute.

That part of the order which vacated the original injunction should be reversed and the original order restored, with costs to the plaintiff.

VAN BRUNT, P. J., concurred.

O'BRIEN, J. (dissenting):

I do not concur with the views of the majority of the court for the following reasons:

The defendant, the Interior Conduit and Insulation Company, is a domestic manufacturing company, having as its president the defendant Johnson, of which company the plaintiff is a stockholder, owning 100 shares of the par value of $10,000. The company had an authorized stock issue of $1,250,000. In February, 1895, a meeting of the stockholders was called for the purpose of increasing the capital stock to $1,575,000, the purpose of which increase was to retire outstanding scrip amounting to $75,000 by converting the same into stock, and to discharge an obligation due by the conduit company to a corporation known as the Johnson Standardizing Company, which latter company had transferred certain patent rights to the former in consideration of an agreement that it should receive $250,000 of the capital stock of the conduit company therefor. The meeting resulted in an authorized increase of the capital stock by the sum of $325,000, which was the requisite amount for the purposes aforesaid. About the same time the board of directors caused a plan to be formulated for submission to the stockholders, after the approval of the increase of the capital stock, for the creation of preferred stock of $500,000 of the then to be authorized capital stock of the company, and provided further that such preferred stock should be issued upon subscription to the stockholders of the company under a plan by which each stockholder of record was to be entitled to subscribe for the preferred stock to the extent of 40 per cent of his present holdings, paying therefor 50 per cent in common stock of the company, 12½ per cent in dividend scrip or cash, and 37½ per cent in cash. To carry out this plan the directors negotiated with the standardizing company, in lieu of the $250,000 of stock due it from the conduit company and of the $12,500 of dividend scrip owned by it, to pay the gross sum of $87,500 in cash. If this plan had been carried out it would have resulted in a capital stock of $1,500,000, of which $1,000,000 would be common and $500,000 preferred stock; and from the moneys received in payment for such preferred stock the obligations of the standardizing company would be discharged by the payment of $87,500, and there would

be left in the treasury of the company for working capital the sum of $100,000. Inasmuch as unanimous consent, which was necessary under the statute, was not obtained from the stockholders for the issue of such preferred stock — the holders of 300 out of the 12,500 shares having dissented from the plan, and 700 shares not having been voted on — the plan was abandoned.

The conduit company thus found itself with an authorized increased capital of $1,575,000, which, though available if accepted to discharge the obligations to the holders of scrip dividends and the standardizing company, in no way met the need that still existed of supplying the conduit company with cash resources for the conduct of its business. The directors were, therefore, confronted with the necessity of presenting some other plan, and another meeting of the stockholders was called to reduce the stock to $1,000,000 from $1,575,000, to which it had been increased at the preceding meeting. This was done, and thereupon the directors issued a notice, that they had resolved to issue what they termed "gold debenture bonds" to the amount of $500,000, to be subscribed for by the stockholders in the same proportion as was contemplated in the event that the issue of preferred stock had been approved, viz., each stockholder was to be permitted to subscribe to the bonds to the extent of 40 per cent of his stock holdings, and pay therefor 50 per cent in stock at par, 12½ per cent in dividend scrip at par or cash, and 37½ per cent in cash. In that way, it will be seen, it was intended to raise $187,500 out of which to pay the standardizing company $87,500, leaving $100,000 in the treasury as working capital. The question, however, presented itself to the directors as to what should be done in regard to stockholders who would not or could not subscribe for these bonds. Accordingly an alternative was presented by which stockholders not making such subscription were to surrender for retirement one-fifth of their holdings of stock and accept in lieu thereof certificates of interest in the company's surplus, which recited that they entitled the holder "to a fractional interest in the surplus capital of the company. Such surplus capital is represented by the difference between the outstanding capital stock prior to the reduction of the authorized amount thereof and the amount to which the same was reduced;" the stockholder "to receive such fractional interest out of the proceeds of the sale and conversion of said sur-

plus capital into cash at such time or times as the directors shall determine to make such sale and conversion."

To prevent the issue and the circulation in the market of the bonds and the compelling of the plaintiff to accept the certificate of interest as an alternative to subscribing, and in effect to prevent the carrying out of the plan of the board of directors, this action was brought, and a preliminary injunction having been obtained, it was, on motion for its discontinuance, vacated, excepting that the con-, duit company was enjoined from calling upon the plaintiff to surrender any part of his stock for retirement, or to subscribe for the debenture bonds unless he so desired. From that order both plain-, tiff and defendants have appealed, the former upon the ground that the injunction should have enjoined the carrying out of the plan, and the latter upon the ground that it should have been wholly vacated.

With respect to the proceedings taken to increase the stock, and subsequently to reduce or decrease it, the statutory requirements having been fulfilled, these were legal and regular. The criticisms made on such proceedings are in respect to Mr. Johnson's acts as director and stockholder. He was the president of the conduit company, and the principal stockholder in the standardizing company, and it is suggested that his participation in the deliberations of the directors and stockholders is in itself sufficient to taint with invalidity the entire dealings of the company not only with Johnson and the standardizing company, but with the plaintiff and other stockholders. It is not claimed that there was anything wrong in Mr. Johnson's actions, but that his positions as a stockholder and as a creditor were inconsistent. The fact, however, that he had a claim against the company did not prevent his exercising the rights which as a stockholder he undoubtedly had, to participate in the stockholders' meeting and vote, either on his own stock or as proxy of others, in favor of a proposition to increase or reduce the company's capital stock. (*Gamble* v. *Queens Co. Water Co.*, 123 N. Y. 91.)

The effect of the plan to issue the bonds is undoubtedly as claimed by the plaintiff, to place things in practically the same position as they would have been had the minority stockholders consented to the issue of the preferred stock; because the debenture bonds would take precedence of the common stock, and the bonds being dis-

FIRST DEPARTMENT, JUNE TERM, 1895. [Vol. 87.

tributable upon precisely the same plan as the preferred stock was to have been, the plaintiff is entitled to feel as much aggrieved by the one plan as the other. The feelings of stockholders, however, are not the subject of our consideration, our duty being to determine whether the action of the directors in what they propose doing is either so unjust or illegal that it should be restrained by the court. In determining this question regard must be had to the situation of the company, its necessities, and the powers which the directors possess; and so considered, if the contemplated action is neither *ultra vires* nor illegal, the court should not interfere, the rule being that the directors are entitled while acting within the scope of their authority and powers to do what they think best for the interests of the corporation, and it is only when the intended act is illegal, or the directors' purpose is to exceed their powers, or evidence is presented that they are proceeding erroneously to the injury of the corporation, its creditors or stockholders, that the aid of the court will be extended.

In March, 1895, the conduit company found itself with an outstanding capital stock of $1,250,000, being $250,000 in excess of its authorized capital, then reduced to $1,000,000. It was obligated to retire $75,000 of dividend scrip, which, by reason of the recent increase of capital had become immediately convertible into stock; it owed the Johnson Standardizing Company either the sum of $87,500 in cash or $250,000 in stock; and it required some cash for working capital. In this situation the directors, in the interest of every one connected with the corporation, were compelled to take some action or adopt some plan that would relieve it from embarrassment and enable it to continue its operations. The fact that the issuing of preferred stock had been prevented by a minority of the stockholders, who, in the exercise of their legal right, had spoiled the success of that plan, by no means freed the directors from the necessity or responsibility of formulating and carrying out some other which would bring relief to the company. That its condition in March was as stated, and that some action was required on the part of those conducting its affairs, is not seriously disputed. The plaintiff speaks doubtingly in regard to the existence of the claim of the Johnson Standardizing Company, but the support which it receives from the statement of the manner in which it was created

and its character, removes any doubt as to its justice and validity. The directors, therefore, were justified in adopting any fair and legal plan to meet the pressing exigencies of the company; and, with this conceded, the question is narrowed down to whether the contemplated bond issue was authorized and legal.

The plan of issuing the bonds and certificates of interest was one presented by the board of directors and not submitted to the stockholders, and this is one of the grounds assigned against the legality of the scheme. Section 2 of the Stock Corporation Law (Chap. 688, Laws of 1892) expressly authorizes any stock corporation " to borrow money" and to "issue and dispose of its obligations for any amount so borrowed." For this purpose full power is vested in the board of directors, and it is only when it is proposed to mortgage the corporate property and franchises to secure corporate obligations that the consent of the requisite proportion of stockholders is necessary. Here the obligations or certificates of indebtedness which it is proposed to issue under the designation of debenture bonds, are not to be secured by any mortgage upon the franchises or property of the company; and, unless there is some other ground of illegality assigned, it was within the scope of the powers conferred upon the directors to authorize the issue of such obligations without obtaining the consent of the stockholders. Several other grounds of illegality are assigned, however, and these will now be considered.

Section 42 of the Stock Corporation Law provides that " No corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of such corporation. No such stock shall be issued for less than its par value. No such bonds shall be issued for less than the fair market value thereof." It is insisted that this provision is violated in two particulars : *First*, that the bonds are not issued for money, labor done or property received for the use and lawful purposes of the company, and, *second*, that they are not to be issued for the fair market value thereof, but that what in effect is attempted to be done is, to convert the stock and scrip dividends into bonds, and this, it is insisted, is not the issuing of bonds for cash or for property necessary for the use and lawful purposes of the corporation.

As we have seen, if a corporation is in debt it has the power conferred by statute to issue its obligations therefor. A distinction is,

therefore, I think, to be observed between simple obligations to pay an indebtedness; which a board of directors may issue pursuant to section 2, and bonds secured by mortgage, which latter is a lien on property and requires the assent of stockholders and is controlled by section 42 of the Stock Corporation Law. The so-called "debenture bonds" are nothing more than obligation notes or promises to pay, and are not the "bonds" referred to in section 42, which has undoubted reference to bonds secured by mortgage. If, however, section 42 is applicable, then the word "property," as therein used, should be construed to mean anything of value. If so, it cannot be held that an outstanding indebtedness of a live solvent corporation can be regarded as other than a thing of value or property. The "scrip dividends" of this corporation, declared in the previous June, were an existing indebtedness. Their validity is not assailed, nor is it claimed that they were not lawfully and properly issued. It is true they were issued in June, 1894, and the bond scheme was presented in March, 1895. Hence, the inference is sought to be made that the corporation had no right to make such scrip dividends. This is not, however, justified, for it appears that the company had property, real estate and the plant of a going business, the value of which is not claimed to have been overestimated. Its difficulties seem to have arisen from an insufficiency of cash, not of property. In the development of its business it required, and now requires, more cash, and, so far as appears, instead of depleting its treasury of cash, it divided its surplus property by means of scrip dividends, which it had a right to do. If it had been shown or claimed that the "scrip" had been issued unlawfully, or at a time when it had not surplus assets, then an entirely different question would be presented. I concede that a dividend in bonds could not be legally made, nor could a scrip dividend be lawfully declared for the purpose of afterwards issuing bonds to retire them. But where, as here, no charge of that kind is made, and it is assumed by all that a scrip dividend was lawfully made to represent actual surplus assets, then an inference which is lacking in foundation or proof should not be made to the contrary. It cannot, therefore, be assumed, because neither claimed nor proved, that this corporation made a scrip dividend except from surplus profits, pursuant to section 23 of the Stock

Corporation Law. As the "scrip dividends" are not claimed to represent any other than an actual valid outstanding indebtedness of the corporation, bonds to pay the same or other obligations to discharge them could be issued, the same as could be done with respect to any other debts owing by the corporation.

In the way of dividends, what a board of directors may do has been so clearly and fully stated in the well-considered case of *Williams* v. *The Western Union Telegraph Co.* (93 N. Y. 162), that further elaboration is unnecessary, it being therein held, in construing a provision of the Revised Statutes similar to section 23 of the Stock Corporation Law, as follows (head note): "The term ' capital stock' in the provision of the Revised Statutes (1 R. S. 601, § 2) prohibiting the directors of a corporation from making dividends except from the surplus profits of the corporation, or from dividing, withdrawing or in any way paying to the stockholders ' any part of the capital stock of such company,' means the property of the corporation contributed by the stockholders or otherwise obtained to the extent required by its charter. The object of the provision was to prevent a withdrawal of the property, which would reduce the value of its assets below the sum limited for its capital in its charter or articles of association. When the property of the corporation exceeds that limit the excess is surplus, which may be divided among the stockholders either in money or property. Where also a corporation has accumulated such a surplus, and an increase of its share capital has been lawfully authorized, a dividend of shares is not prohibited by said provision; and where such a dividend does not exceed in amount the amount or value of the surplus, it is not in conflict with any principles of public policy."

Having issued scrip dividends, and their validity not having been assailed, they became obligations of the company, and in receiving them in part payment of the bonds issued, the corporation obtained property.

In regard to accepting the stock in part payment, a similar line of argument may be pursued. It is true it appears that the stock of the company has a market value of but forty dollars a share, but it does not therefrom necessarily follow that that is its value. Whatever may be the value of the company's stock upon the market, so long as the capital is unimpaired — which as to this company appears

to be the case — it may be assumed, for the purposes of purchase and retirement, to be of its full face value. This being so, it is shown that the bonds are to be issued for cash for dividend scrip which are obligations of the company, and the return of a certain proportion of the stock which it was not only lawful but necessary for the corporation to get possession of, to the end that it might be canceled and thus bring the stock down to the authorized amount.

It will be noticed that, by the section of the Stock Corporation Law quoted (§ 42), while the stock shall not be issued for less than its " par value," bonds may be issued for their " fair market value ; " and plaintiff does not make it appear that the debentures are to be sold at less than their fair market value, which it would be necessary for him to show if he desired to prevent their being sold. The company received par value for this stock, and when purchasing it for the purpose of retirement, no injustice is done by giving for it the same price that it received; particularly as it is here shown, as before stated, that the capital of the company is unimpaired, and the stock is, presumably, intrinsically worth its par value.

Cook, in his work on Stock and Stockholders, says (§ 282) : " If a corporation has power to reduce its capital stock, it has been held that it may do so by purchasing and retiring a portion of its shares." (*City Bank of Columbus* v. *Bruce*, 17 N. Y. 507 ; *Seeley* v. *N. Y. Nat. Exch. Bank*, 8 Daly, 400, 405 ; affd., 78 N. Y. 608.) There is authority, therefore, for the position that where a reduction of a company's capital stock is sought, it may be accomplished by the company's buying its own stock for retirement or by requiring a *pro rata* surrender of the same by its stockholders. In the latter event the statute provides (Stock Corp. Law, § 46) : " If the capital stock is reduced, the amount of capital over and above the amount of the reduced capital shall be returned to the stockholders *pro rata* at such times and in such manner as the directors shall determine." Upon the reduction of the capital stock, therefore, it became incumbent, under the statute, to return to the stockholders the surplus, though the time and manner in which that should be done was committed to the directors. In distributing surplus assets, after diminishing the capital, reason and authority require that this shall be done equally and without any partiality or preference. As said in *Jones* v. *Terre Haute & Richmond R. R. Co.* (57 N. Y. 206) : " After a dividend

is declared each stockholder has a right in severalty to his particular proportion, and this right, cannot, I think, be abridged by any discrimination of the directors in any form whatever ; " and it is only when the corporation has on hand actual capital sufficient to pay its debts, and in excess of the amount to which it has reduced its capital, that such excess may be distributed. (*Strong* v. *Brooklyn Crosstown R. R. Co.*, 93 N. Y. 426.) A distribution of surplus capital, therefore, is like a distribution of surplus profit when a dividend is declared ; it is intended as a distribution among the stockholders of something on hand above the liabilities of the corporation, without the impairment of the reduced capital stock, and there must be equality among the stockholders without any unfair discrimination. As said in *Seeley* v. *N. Y. Nat. Exch. Bank* (8 Daly, 403) : " If the retired capital be a liability of the corporation in favor of the shareholders who give up the stock that is called in, the payment of that debt cannot lie in any man's discretion.   Payment cannot be deferred, because the directors believe it for a creditor's advantage to keep him out of his money."

Applying these principles to the facts, as they appear with reference to the respective terms of the debenture bonds and the certificates of interest, we find that so far as the subscribers to the bonds may be affected, assuming there is an excess of capital, they receive obligations of the company entitling them to share in such excess.   But what is the position of those who are compelled to surrender a portion of their stock and take in lieu thereof the " certificates of interest in surplus capital ? "   That they do not obtain equal rights with the holders of the bonds is evident, it appearing that the bondholders will be paid out of the entire assets a definite amount in gold, at a fixed time, with interest, while the holders of the certificates are to be paid out of the surplus assets, if any, without interest, at a time not fixed, such sum as may be realized when the surplus assets are sold and the amount determined.   In addition the bond to the extent of fifty per cent thereof is issued for the amount, par value, of stock surrendered, while the holders of certificates are to receive only such percentage or proportion of the property as the surplus assets when converted into cash will justify.   But back of these inequalities, the more serious question is presented, whether there will be any surplus capital to divide among

those who surrender their stock. So far as the statement goes, it shows such a surplus; but when we undertake to analyze the character of the assets, and the condition of the company, it is difficult to determine what there will be for distribution.

When it was proposed to issue $500,000 of preferred stock, the company had an unsatisfied judgment against it of $3,800, and was without sufficient money in its treasury to carry on operations, and the purpose of issuing it was to discharge obligations to a large amount which at that time were pressing. Its assets not being available to discharge such obligations, the plan for the issuance of the preferred stock was proposed. That having failed, the reduction of stock took place and the bond plan was resorted to to accomplish the same end, viz., to discharge existing obligations and debts, and to place the company in funds with which to carry on its business. The surplus in assets mainly consists of the value placed upon certain patent rights and inventions essential to the company's business. These could not be sold or converted into cash without destroying or injuring the business, and it is difficult to see in what way there ever can be a distribution of surplus assets, because there is nothing in excess of the necessities of the company which for that purpose can be sold. If, as contended, these patents in their entirety are essential to the company's business, how is it possible to take any portion and segregate it for the purpose of sale and distribution? And yet, outside of the value attached to the plant, fixtures and patent rights, and the real estate and buildings used by the company in its business, the remaining assets consist of customers' accounts and goods on hand and in process of manufacture. The main asset, however, is the plant, fixtures and patent rights, which are placed at over $1,000,000. This statement shows that the capital of the company is principally based upon the value of the patent rights and inventions held by it; and it could not for a moment be assumed that the company intended ever to sell or part with them, because they are essential to the carrying on of its operations.

As the "certificates of interest in the surplus" proposed to be given therefor impress no fixed obligation upon the company, and it is problematical whether the holder will ever receive any portion of the surplus capital that exists, and as the stockholders, who are obliged to receive these, are not placed in an equally favorable posi-

tion in respect to the distribution of such surplus with those who may subscribe for the bonds, we think a case was made out for an injunction until such time as upon a full showing at the trial it could be made to appear that plaintiff and those who stood like him in the position of non-subscriber to the bonds would be equally, fairly and proportionately dealt with in the distribution. Upon this ground, therefore, we think the plaintiff was entitled to an injunction *pendente lite.*

Considering the interests of the company and the conceded good faith of the directors and their honesty of purpose in presenting the bond plan, I have sought for some way to meet this last legal objection, so that they might, without interference by the court, carry it into successful operation. That nearly all the stockholders and those interested in the company desire it, and that it would be of advantage to the company, and that those who participate therein by subscribing for bonds would receive a just proportion of surplus assets, appears. The plaintiff, however, being either unwilling or unable to comply with the terms of the subscription, has the legal right to object to a plan by which, in lieu of stock surrendered, he is obliged to take the proposed "certificates of interest in the surplus." But upon all the facts, if an alternative can be found that will give full protection to the plaintiff, the court should accord that, instead of injuring the interests of all the others concerned by enjoining the carrying out of the bond plan. The defendants tendered in the court below a stipulation that if the plaintiff did not desire to subscribe for the debentures, he might retain his full holding of stock without surrendering any portion for retirement. Should plaintiff be unwilling to accept such offer now, then in addition the defendants should enter into an undertaking to the effect that should the trial court decide in plaintiff's favor, then, instead of certificates of interest, they would pay him the par value of his stock which they retired.

The order should be modified in accordance with the views expressed, and upon defendants complying with the conditions fixed, it should be without costs to either party on this appeal; otherwise, with costs to plaintiff.

Order reversed in so far as it vacated the original injunction, and the original order restored, with costs to plaintiff.