was right in refusing to award him the stock. But, assuming that there was some evidence of that fact, still a question of·fact was presented for the trial court to determine, and it certainly cannot be said that this unsworn declaration of one of the bankrupts, after he had lost all interest in the question, was sufficient to compel the court to find as a fact that this stock belonged to the plaintiff. The court, having the question before it, has decided that the evidence was not sufficient to sustain a finding of the plaintiff's ownership of the stock, and I agree with the court below that the evidence was not sufficient. Certainly it was not so clear and convincing as to justify us in reversing the finding as against the weight of evidence.

---

(37 Misc. Rep. 618.)

### CONTENT et al. v. METROPOLITAN ST. RY. CO. et al.

### WORMSER v. SAME.

(Supreme Court, Special Term, New York County. April, 1902.)

1. STREET RAILROAD—LEASE TO SIMILAR CORPORATION.
    The majority of the stockholders of a street railway company sought to restrain the delivery and operation of a lease by it to another railway company on a vote of 80 per cent. of the stockholders of the lessor and the unanimous vote of those of the lessee. *Held*, that the lease was not void on its face, as constituting an illegal transfer of the properties and effects of the lessor.

2. SAME—RIGHTS OF MINORITY STOCKHOLDERS.
    Where the guarantied rental did not appear to be inadequate, the lease was not a fraud on the minority stockholders.

3. SAME—DIRECTORS—PRESUMPTIONS.
    The directors of a street railway company, in the absence of proof to the contrary, will be presumed to have acted in good faith in leasing the railroad to another such company.

4. SAME—CONSIDERATION FOR LEASE.
    The execution of a lease by a street railway company to another for 99 years at a rental of 7 per cent. on the valuation of the property is not a fraud on the minority stockholders, in that it limits the annual dividends, no matter how great the earnings and the profits of the system may become.

Action by Harry Content and Walter Content against the Metropolitan Street Railway Company and others and by Isidor Wormser against the Metropolitan Street Railway Company and another. Motion to continue a temporary injunction pendente lite. Denied.

Anderson, Pendleton & Anderson, for plaintiff Wormser.

Scharps & Scharps (William C. DeWitt, Treadwell Cleveland, Parker C. Chandler, and Benjamin Scharps, of counsel), for plaintiffs Content.

Henry A. Robinson (Charles F. Brown, William D. Guthrie, Edward Lauterbach, and Paul D. Cravath, of counsel), for defendants.

GILDERSLEEVE, J. These actions are brought by stockholders of the defendant Metropolitan Street Railway Company to restrain the delivery and operation of an alleged lease dated February 14, 1902, between the Metropolitan Street Railway Company and the Interurban Street Railway Company, also a defendant herein. The

lease having been entered into by the board of directors of the Metropolitan Street Railway Company, subject to the approval of the stockholders, a meeting of the stockholders was called to take action thereon, and the alleged contract of lease was ratified by a vote in favor thereof of about 400,000 shares, equal to about 80 per cent. of the entire capital stock. The plaintiffs hold a very substantial portion of the capital stock, and are among the minority stockholders who opposed the ratification. The said lease has been executed by the officers of the Interurban Company, and approved by the board of directors and by the unanimous vote of the stockholders. The Metropolitan Street Railway Company is a street railway company, having a capital of $52,000,000, consisting of 520,000 shares of the par value of $100 each. It owns, or has leased, and is operating over 400 miles of street railroads in the boroughs of Manhattan and the Bronx, in the city of New York. The stock of the Metropolitan Street Railway Company is now selling at a premium of about 60 per cent., and pays, and for three years last past has paid, a dividend of 7 per cent. on its capital stock. The Interurban Street Railway Company is a street railroad corporation organized and existing under the laws of the state of New York. It was organized with a capital stock of $500,000, to acquire, and it did acquire, the property and franchise of an existing street railway company. The Interurban Company operates a street surface railroad of about four miles in length in the county of Westchester, N. Y., and its equipment consists of only five cars. In February, 1902, its capital stock was increased to $20,000,-000, and $500,000 of such stock has been duly issued for property purchased, and $12,500,000 thereof has already been actually subscribed for in cash at par. The Metropolitan Securities Company was organized on or about February 14, 1902, under the business corporations law of the state of New York, with a capital stock of $30,000,000. It has acquired all of the issued capital stock of the Interurban Company, and all of the capital stock and other securities of the Peoples' Traction Company of the city of New York and of the New York, Westchester & Connecticut Railroad Company. It is authorized by its charter "to purchase, acquire, hold and dispose of the stocks, bonds and other evidences of indebtedness of any corporation, domestic or foreign, and issue in exchange therefor its stock, bonds or other obligation." Through the franchise which the Interurban Company directly owns, and through its arrangements with the Peoples' Traction Company and the New York, Westchester & Connecticut Railroad Company, it now controls franchises for street railroads for about 58 miles of streets in the borough of the Bronx in the city of New York and the adjoining territory in Westchester county. Though it now operates, as we have said, but about four miles of road, we are assured that it contemplates, in the near future, building many miles of railroad, electrically equipped, under the franchises above referred to. The actual cost to the Metropolitan Securities Company of the stock and other securities of the three companies last named is something more than $1,250,000. It appears from the copies of contracts in evidence here that the Metropolitan Securities Company agrees to pay $23,000,000 to the Interurban Com-

pany for $12,500,000 of its capital stock and $15,000,000, face value, of its 3 per cent. debentures.    Messrs. Kuhn, Loeb & Co., bankers, of the city of New York, have underwritten at par the entire capital stock of $30,000,000 of the Metropolitan Securities Company, conditioned upon the approval of the lease which is here the subject of litigation by the said defendants the Metropolitan Street Railway Company and the Interurban Company.

From the foregoing details must be gathered the character and strength of the Interurban Company and an estimate of its ability to perform the covenants in its behalf in said lease.    That we may better understand the status of the Securities Company, it is proper to state that under the agreements in force the Securities Company is entitled to receive from subscription to its stock $30,000,000, of which $23,-400,000 is to be paid to the Interurban Company.    The remaining $6,600,000 is retained by the securities company for the cost of acquiring the shares of stock and bonds of the Interurban Company, the Peoples' Traction Company, and the New York, Westchester & Connecticut Railroad Company, as above mentioned, and for other corporate purposes.    The condition of the Metropolitan Street Railway Company, prior to the adoption of the plan which the directors are now seeking to carry out, in respect of its liabilities and apparent necessities, was substantially as follows, namely:    It had a floating debt of about $11,000,000, and horse car lines that it was necessary to improve for the company's future by replacing them with electrical power and improved rolling stock, which change and improvements it is estimated would call for an expenditure of about $12,000,000. The management, therefore, were confronted with the necessity of raising a total fund of about $23,000,000.    The Metropolitan Street Railway Company had assets available for the purpose of raising the said $23,000,000 as follows:    About $8,000,000, par value, of the Third Avenue Railroad Company's stock, on which the Metropolitan Street Railway Company has guarantied a dividend, shortly to become due, and also claims against subsidiary lines approximating $13,000,000. The lease of the Third Avenue Railroad Company, held by the Metropolitan Street Railway Company, had, as yet, proved unprofitable. What was the plan, by which this sum of $23,000,000 could be provided, that, when carried out, would be most likely to result in the best interest of the stockholders of the Metropolitan Street Railway Company?    The directors decided that a sale of the foregoing securities and claims for $23,000,000 and a lease on a guarantied rental of 7 per cent. promised the best results.    This plan is assailed by the minority stockholders, the plaintiffs in these actions.    Temporary injunctions have been granted, restraining the delivery and operation of the lease.    The motions now under consideration are to continue the injunction pending the trial of the actions.

The business done by corporations in this country is of great magnitude, and embraces every field of industry.    Where the shares are widely distributed, it is comparatively easy for a few men, who once acquire control, though holding but a small portion of the stock, to continue in power.    For instance, the entire holding of the present board of directors of the Metropolitan Street Railway

Company is but about 28,000 out of 520,000 shares. It is of the highest importance that the officers and directors of a corporation should have the confidence of the stockholders. This is indispensable to the peaceful and secure enjoyment by an owner of the property represented by certificates of stocks or bonds. In the selection of officers and directors, and in all matters requiring action by the stockholders, generally, the will of the majority must govern. "The powers of a majority to bind the whole company by their vote is derived solely from the agreement of association between the shareholders. The majority are not authorized to represent the company in any transaction which is not in pursuance of its chartered purposes." Mor. Priv. Corp. §§ 474, 475. The acts, therefore, of the officers and directors, although approved by a majority of the stockholders, are properly subjected to the freest inquiry and closest scrutiny by any stockholder, and, when challenged, and the protection of the court invoked, should receive most careful consideration.

Two grounds are urged in support of the contention of the plaintiffs.

First. The plaintiffs assert that the action of the directors in making the lease, notwithstanding its ratification by more than two-thirds of the stockholders, is not within the corporate powers, and should be set aside on the ground that it is illegal on its face, and void as a matter of law. It is the plaintiffs' contention that the agreement and lease made by the directors operate as an assignment and transfer to the lessee of all the properties, franchises, assets, and effects of the Metropolitan Street Railway Company, and that, if the action of the directors in making this lease had been approved by all the stockholders, it would still be invalid, since it sells and conveys all the powers, rights and privileges, assets and property, of the Metropolitan Street Railway Company. It is clear that the provisions of section 78 of the railroad law authorize a lease from one railroad corporation to another, by which the lessee may acquire the use of the lessor's road. After a careful examination of the lease in question, I am of the opinion that the provisions of section 78 have been complied with. The fallacy of plaintiffs' claim that there is a merger and consolidation of the two companies is too apparent to call for discussion. The claim that the lease to the Interurban Company violates existing leases or agreements cannot be sustained. The danger that might be apprehended under the law from the nonassignability of existing leases seems to have been thoroughly guarded against; at least I am so convinced from a careful reading of the instrument. What may develop upon the trial, when all the facts may be more sharply presented and the law more carefully considered, I do not undertake to say. I hold that the lease cannot be said to be void upon its face, as a matter of law, and therefore that the continuance of the temporary injunctions cannot rest upon this ground.

The second ground urged by the plaintiffs as a reason for continuing the temporary injunctions is as follows:

"The scheme of transferring the entire assets, properties, franchises, powers, and privileges of the Metropolitan Company to the Interurban Company,

as developed in the so-called lease, and the various agreements relating therto, constitutes in law a fraud upon the minority stockholders."

It is the claim of the plaintiffs that the scheme or plan of lease in the case at bar has all the elements and characteristics of that before the court in the case of Flynn v. Railroad Co., 158 N. Y. 493, 53 N. E. 520, which the court of appeals condemned as fraudulent. In that case it was established that the corporate action of both the lessor and the lessee was controlled by the same persons. Such is not the fact here. In the Flynn Case it appeared that the trustees enjoyed a profit not shared in by the stockholders at large. I can find no evidence here to support such a charge. If the case at bar is to be brought within the condemnatory rule laid down in the Flynn Case, it must rest upon inadequate rental, which was there held to be one fatal vice inherent in the transaction. In considering this branch of the case, we must follow the doctrine declared by the court of appeals in Gamble v. Water Co., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527. It was there held that a minority is not justified in coming to a court of equity for relief where there is a difference of opinion among the shareholders upon a question of mere administration or of policy; nor, even in doubtful cases, where the action of the majority may be susceptible of different constructions; and the court said:

"A case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company, and in a manner inconsistent with its interests; otherwise the court might be called upon to balance the probabilities of profitable results to arise from the carrying out of one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seemed to it to promise the best results, or at least to enjoin the carrying out of the opposite policy."

The court will not place its opinion in the balance against the opinion of a large majority of the stockholders, and declare against their policy, where they are acting within their corporate powers.

In the Flynn Case it is said:

"All questions within the scope of the corporate powers which relate to the policy of administration, to the expediency of proposed measures, or to the consideration of contracts, provided it is not so grossly inadequate as to be evidence of fraud, are beyond the province of the courts."

The court will not substitute its own judgment upon a business proposition for that of the directors and of a majority of the stockholders, provided they are acting honestly. I can find no evidence here that overcomes the presumption that the directors and majority stockholders are acting in good faith.

It is urged by the plaintiffs that, instead of the plan adopted for raising the required $23,000,000 by a sale of securities and a lease on a guarantied rental of 7 per cent., the directors should have undertaken to have secured the money from the stockholders of the Metropolitan Street Railway Company by an increase of stock or a further issue of bonds, which, plaintiffs claim, could have been read-

ily sold at par; and that it was practicable to procure $10,000,000 for Third Avenue Railway Company stock. The reply to this by the Metropolitan Street Railway Company is that, if new stock were issued, the present annual dividend at the rate of 7 per cent. would have to be greatly reduced, and that, if new bonds were issued, an additional fixed charge would be incurred, and the dividend would likewise have to be reduced; and that a reduction of the dividend would greatly depreciate the market value of the stock, and that many investors, especially among small holders, would be seriously embarrassed by a reduction in income. Moreover, it appears that with the fixed character as at present, and with a guarantied dividend upon the Third Avenue Railway Company stock, not yet payable, the Metropolitan Street Railway Company was about $31,000 short last year of earning a dividend of 7 per cent. Furthermore, the Metropolitan Street Railway Company alleges that other systems and methods of transportation and the probability of additional taxes are likely, in the near future, to impair its net earnings. We should not continue this line of argument.

It will be observed that we are balancing the probabilities of profitable results, and undertaking to determine which of two plans seems the most promising. This is not within the province of a court of equity. It cannot be said that the rental is grossly inadequate, nor that the sale of securities was improvident or unnecessary, or that the consideration of $23,000,000 was not a fair value. It appears from the papers before me that the Interurban Company, having obtained from the Securities Company the right to subscribe for $23,400,000 of the stock of said Securities Company, accords to the stockholders of record of the Metropolitan Street Railway Company the opportunity of subscribing pro rata according to their respective holdings for said $23,400,000 of capital stock at par, upon the same terms, as to time of payment of subscriptions, as are accorded to other subscribers. This stock, as we have seen, has been underwritten at par by Messrs. Kuhn, Loeb & Co. It is claimed by plaintiffs that this privilege compels the minority stockholders to take their interest in the surplus value of the property over the 7 per cent. in a different enterprise, and, in effect, amounts to a compulsory diversion of part of the stockholders' property to another business outside of the chartered purpose of the company. I cannot agree with this contention. I see in this option no element of fraud or illegality. The lease was submitted to the stockholders irrespective of any consideration in respect of this option to take the stock in the Securities Company. It is a privilege which the stockholders are at liberty to avail themselves of, should they so desire. The organizers of this Securities Company are prepared to make the whole investment of $30,000,000, which must be taken as an indication of good faith of the managers of the Securities Company and their confidence in the interurban enterprise. I cannot see that this feature of the transaction has any bearing upon the legality of the lease or the wisdom or justice of the plan for raising the $23,000,000 adopted by the Metropolitan Street Railway Company directors. The lease must stand or fall on its own merits,

wholly irrespective of the relations between the Securities Company and the Interurban Company or the option mentioned. It is true that, if the lease becomes operative, the stockholders are limited to an annual dividend of 7 per cent. for 999 years, no matter how great the earnings and profits of the metropolitan system may become. It is true that, should the net earnings of the system in time exceed 7 per cent., the holders of the stock of the Metropolitan Securities Company would get the benefit. These considerations, however, do not affect the bona fides of the plan now sought to be carried out by the Metropolitan Street Railway Company.

The discussion still turns upon the two points to which we first directed our attention, namely: (1) Is the lease void on its face for illegality? (2) In view of all the facts and circumstances disclosed on this motion, is the rental grossly inadequate and the plan a fraud upon the minority stockholders? These questions must be finally determined when the actions come to trial. I fail to find sufficient grounds to warrant a continuance of the injunctions pendente lite. The motions to continue the injunctions are denied, and the temporary injunctions are set aside, with $10 costs in each case.

Motions denied, and temporary injunctions set aside, with $10 costs in each case.