(83 Misc. Rep. 340.)

CONTINENTAL SECURITIES CO. et al. v. BELMONT et al.

(Supreme Court, Special Term, Nassau County. December 23, 1913.)

1. CORPORATIONS (§ 317*)—DIRECTORS—FRAUD—SUFFICIENCY OF EVIDENCE.

In 1900 M. had a contract for the construction and operation of a subway, but had not the money nor financial standing to carry out the contract. B. organized a subway construction company, and an agreement was made by which M. and his associates were to receive one-fourth and the construction company three-fourths of the profits of the construction and operation. The subway was thereafter constructed by the construction company, and it became necessary to provide for an operating company, but in the opinion of counsel no statute authorized the incorporation of a company for that purpose, and it was therefore necessary to procure the control of some existing corporation owning or operating, in whole or in part, a railway in the same city. B. and his partner for $272,000 purchased the control of such a company, and an agreement was then made between B. & Co. and all parties interested in the subway enterprise by which B. & Co. were to procure and dispose of to the enterprise at such profit as they might deem reasonable the securities necessary to complete the operating plan, with the right to abandon the agreement at any time; the contract further providing for the raising of additional capital for equipment and for the organization or reorganization of an operating company. Thereafter the Legislature, as the result of B.'s influence, authorized the incorporation of an operating company, and a charter was granted the Rapid Transit Company, which afterwards operated the subway. B. & Co. thereafter dedicated to the subway enterprise the railway charters theretofore procured by them, including B.'s right to compensation for creating the enterprise, amalgamating the respective interests into a single property and the cost of securing such railroad company's securities, in consideration of the issuance of a participating certificate for 15,000 shares of the operating company, of the par value of $1,500,000, which were issued to B. & Co. by the directors of the Rapid Transit Company, one of whom was B., thereafter. *Held*, that the properties turned over to the Rapid Transit Company and the services rendered it by B. & Co. were not of so small a value as to render the issuance of the stock a gift or bonus, amounting to fraud, rendering the directors of the Rapid Transit Company liable to account therefor.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401–1414; Dec. Dig. § 317.*]

2. CORPORATIONS (§ 320*)—DIRECTORS—STOCKHOLDER'S ACTION AGAINST DIRECTORS.

In a stockholder's action on behalf of all the stockholders and the corporation against directors to compel them to account for stock alleged to have been issued by them to one of them fraudulently, illegally, and with no valid or adequate consideration, but upon an alleged consideration that was a pretense and subterfuge, and intended to cover a gift or bonus, where the complaint charged that the shares were distributed by the director to whom they were issued in part to some or all of the other directors, that the other directors were merely his creatures and dummies, that the intention to take such action was concealed, that each of the directors knew that such action was in fraud of the corporation's rights, and that the directors strenuously concealed the transaction, and instructed the officers to falsely represent the transaction, the basis of the action was fraud, conspiracy, and concealment, and there could be no recovery without proof of fraud.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. § 320.*]

---

3. FRAUD (§ 49*)—ACTIONS FOR FRAUD—EVIDENCE.

Where an action is based upon fraud, plaintiff cannot recover by proving a right of action of some other character, and the fraud must be actual and intentional fraud involving bad faith, and not a mere breach of duty or omission to exercise due care, sometimes called legal or constructive fraud.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 44, 45; Dec. Dig. § 49.*]

4. CORPORATIONS (§ 320*)—DIRECTORS—FRAUD—SUFFICIENCY OF EVIDENCE.

In a stockholder's action against directors to compel them to account for the value of stock claimed to have been issued without a valid consideration to one of the directors, the mere fact that such director dominated or controlled the other directors was not sufficient proof of fraud to call for an explanation from the defendants.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. § 320.*]

5. CORPORATIONS (§ 320*)—STOCKHOLDER'S ACTION ON BEHALF OF CORPORATION.

A stockholder may bring an action in behalf of the corporation for the benefit of himself and other stockholders to set aside fraudulent transactions consummated at the expense of the corporation before he acquired his stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. § 320.*]

6. CORPORATIONS (§ 316*) — DIRECTORS — DEALINGS WITH CORPORATION — PRESUMPTION.

A presumption exists in equity against a transaction between the directors of a corporation in its behalf and a codirector, which the director or trustee dealt with has the burden of explaining.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401, 1402, 1404–1406, 1408, 1409, 1412–1414; Dec. Dig. § 316.*]

7. CORPORATIONS (§ 307*)—DIRECTORS—DUTY TOWARDS CORPORATION.

The relation of an officer of a corporation to it is fiduciary, and he must at all times act in good faith and unselfishly toward the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1350, 1351; Dec. Dig. § 307.*]

8. CORPORATIONS (§ 316*)—DIRECTORS—DEALINGS WITH CORPORATION—VALIDITY.

Where a profit is made by a director in a transaction with a corporation, that is honest in itself and is open and fully disclosed, and consummated after an honest statement of the facts to the board of directors and to the stockholders, the director is not liable to the corporation for such profit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401, 1402, 1404–1406, 1408, 1409, 1412–1414; Dec. Dig. § 316.*]

9. COURTS (§ 87*)—RULES OF DECISION—SOURCE.

The courts are bound by recognized precedents and customs, which are accorded legal effect, and by equitable principles of abstract justice, which owe their binding force to judicial decisions.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 306–310; Dec. Dig. § 87.*]

10. LIMITATION OF ACTIONS (§ 37*)—LIMITATIONS APPLICABLE—ACTIONS FOR FRAUD.

A stockholder's action on behalf of the stockholders and the corporation against directors to require an accounting for stock claimed to have been illegally and fraudulently issued by them to one of the directors was

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

within the ten-year statute of limitations, as the cause of action was for fraud.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 182–186, 477; Dec. Dig. § 37.*]

Action by the Continental Securities Company and another, stockholders in the Interborough Rapid Transit Company, on behalf of themselves and all other stockholders and on behalf of the company, against August Belmont and others. Judgment for defendants.

See, also, 150 App. Div. 298, 134 N. Y. Supp. 635.

J. Aspinwall Hodge, of New York City, for plaintiffs.

Richard Reid Rogers, of New York City (Albert J. Kenyon, of New York City, of counsel), for defendant Interborough Rapid Transit Co.

Nicoll, Anable, Lindsay & Fuller and Davies, Auerbach & Cornell, all of New York City (De Lancey Nicoll, Joseph S. Auerbach, Courtland V. Anable, and Charles H. Tuttle, all of New York City, of counsel), for other defendants.

VAN SICLEN, J.  The plaintiffs, as stockholders of the Interborough Rapid Transit Company, have brought this action, in behalf of themselves and other stockholders similarly situated, against the directors of said company and said company, to compel the former to account for 15,000 shares of the capital stock of said Interborough Rapid Transit Company, alleged to have been fraudulent and illegally issued to the firm of August Belmont & Co., and without any valid or adequate consideration therefor, but upon and for an alleged consideration that was a mere pretense and subterfuge, intended to cover a gift or bonus to the said firm.

The nature of the action and the questions whether the plaintiffs could maintain the same, and if so, whether the original complaint herein states a cause of action, have been fully discussed and definitely decided by this court and the appellate courts. 75 Misc. Rep. 234, 133 N. Y. Supp. 560, affirmed 150 App. Div. 298, 134 N. Y. Supp. 635, affirmed 206 N. Y. 7, 99 N. E. 138, the effect of all of which has made it mandatory upon this court at this time to proceed to a complete trial of the issues involved upon the merits.

By the supplemental complaint herein the plaintiffs claim to be entitled to the same relief as by and under the original complaint, alleging the purchase and ownership by the plaintiff Venner of 100 shares of stock of said Interborough Rapid Transit Company on August 8, 1912, more than two years after the commencement of this action. The questions as to whether the plaintiffs are entitled to relief under the supplemental complaint will not become important, unless it first be found that plaintiffs are entitled to relief under the original complaint; for if it be found that plaintiffs had no cause of action under the original complaint, obviously by the subsequent purchase of stock and a supplemental complaint no vitality can be imparted to the existing action. Further, it appears that the plaintiffs' right to sue on the shares mentioned in the supplemental complaint was barred by the statute of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

limitations at the time of the service thereof, all of which fully appears in the answers to said supplemental complaint.

At the outset it may be well for this court to ignore entirely the identities of the parties to this action, except possibly in considering them relative to the questions of credibility and good faith. Obviously no weight or virtue can be added to this court's memorandum by indulging in invectives or branding the plaintiff Venner, or his so-called alter ego or vehicle, the plaintiff Continental Securities Company. If heretofore the judicial records and published opinions of various state and federal courts tend to establish that said Venner is an artificer of litigation and a menace to corporate society, an added curse will work no cure. Likewise with reference to the individual defendants, no platitudes of this court can add to or detract from their alleged worth and high standing. Manifestly, in justice to all the parties hereto, sitting as court and jury, this court should fully and fairly consider only the evidence in the record as presented and render such decision as may be strictly in accordance with the facts and supported by the law applicable thereto.

[1] There is no necessity for a historical review of rapid transit conditions existing in the city of New York previous to the year 1900, and the pressing necessity for improvement therein and the various attempts made by the board of rapid transit commissioners and others for a satisfactory solution of the extraordinary problems presented, except so far as to state that no solution thereof had been discovered or worked out until the latter part of the year 1899, when one John B. McDonald, now deceased, and whose testatrix is a party defendant herein, appeared and became a successful bidder for the construction and operation of the subway. It appears, however, that while the action of said McDonald was heroic in adopting the subway waif, still he had neither the money nor the financial standing to maintain and support it, and was compelled to look to others for the fulfillment of his contract. Said contract provided, first, for the construction of the subway, and second, its equipment and operation for 50 years, with a right of renewal, upon certain terms, for a further period of 25 years. Said McDonald was unable to meet the requirements called for by his contract with the city, and after certain extensions thereof the defendant Belmont appeared and induced others to join with him with sufficient financial standing and faith in the enterprise to proceed with the work. The organization of the Rapid Transit Subway Construction Company followed, and under an appropriate agreement McDonald and his associates were to receive one-fourth of the profits of construction, and the Subway Construction Company three-fourths of the profits of construction, and at the proper time and under certain conditions McDonald was bound to transfer to an operating company, when formed, the right to operate the railroad. Thus, in substance, McDonald and his associates held one-fourth, and the Subway Construction Company three-fourths, of both the profits of construction and operation of its subway.

August Belmont & Co. had associated with themselves, either as directors of the Subway Construction Company or as stockholders, men

of ability and financial standing, and under the direction of said board of directors the physical construction of the subway made such progress that at the end of 1900 there was a favorable prospect for its successful completion, and it became necessary to provide for an operating company. At the time it seems that, in the opinion of eminent counsel, neither the Railroad Act nor the Rapid Transit Act made due provision, or was sufficiently comprehensive to authorize the incorporation under them, or either of them, of a subway operating company. It appears, however, that attempts were made, not only by the parties in interest, but by the rapid transit commission, to secure an amendment from the Legislature of 1901 which would permit the incorporation of such an operating company, but that such attempts were unsuccessful, and it became a pressing necessity that the control of some existing corporation to take an assignment of the operating lease should be obtained, and that the only corporation so qualified was a corporation owning or operating in whole or in part a railway in the city of New York. Thereupon August Belmont & Co. located such a charter, namely, the connecting railroads, known as the City Island and Pelham Park Railroad Companies, and with their own money and at their own risk began to buy the securities thereof, using due effort to prevent their purchase from becoming known to rival and hostile interests, or to the holders of such securities.

In the fall of 1901, when said purchase had been practically completed, the agreements of December 16, 1901 (Exhibits 19 and 20) were executed, whereby August Belmont & Co. had the right to buy and to dispose of to the enterprise at a profit, such as they might deem reasonable and without accountability, the securities which in their judgment were necessary or essential to complete the operating plan for the subway, and also the right to abandon the agreement at any time. Said contracts or agreements also provided for the raising of additional capital required for equipment purposes, and for the organization or reorganization of an operating company, including the shares of stock which August Belmont & Co. were authorized to acquire and dispose of at a profit; and they also provided for the payment to the stockholders of the Construction Company and to McDonald and his associates in capital stock. Said agreements were duly entered into by every interest in the enterprise. It may be conceded that, in view of the refusal of the Legislature in 1901 to pass an amendment enabling the organization of an operating company, the possession of the Pelham Park and City Island charters was of great value; and it appears that at the assembling of the Legislature of 1902 a similar form of opposition manifested itself. Thereupon it appears that Mr. Belmont's diplomacy or influence, political or otherwise, was able to procure a withdrawal or cessation of the opposition or hostility to the legislative enactment desired, and in April, 1902, the act was amended so as to permit the organization of the Interborough Rapid Transit Company, and thereafter and on or about May 14, 1902, a charter was granted it.

Theretofore, and in January, 1902, August Belmont & Co., with the knowledge of the directors of the Construction Company and others, dedicated to the subway enterprise the City Island and Pelham Park

charters in consideration .of the issuance to them of a participating certificate for 15,000 shares of the operating company to be formed, and included therein his right to compensation for creating the enterprise, the amalgamation of the respective interest into a single property, including the cost of securing; the City Island and Pelham Park Railroad Companies' securities, amounting to some $272,000, and the security of profits of the 75-year lease. Such dedication or offer was an entirety, and so understood by all parties in interest. Said 15,000 shares of the stock of the operating company to be formed were necessarily to be issued at par, but it must be manifest the real value thereof depended and was contingent upon the success of the enterprise. Of said 15,000 shares, no one, other than those connected with August Belmont & Co., received any number, except said McDonald, who received 1,000 shares in recognition of his assistance to August Belmont & Co. and to the enterprise. About the same time, like certificates of the corporation to be formed were issued to the parties in interest—$2,500,000 to McDonald, $9,600,000 to the shareholders of the Subway Construction Company, and over $10,000,000 to the subscribers to the new capital stock.

. The whole transaction in various forms was thereafter set forth in the company's books, and it may be that, had the same been made to appear therein, so as to disclose all the facts which were then in the possession of· the management of the enterprise, there would at no time thereafter have been just cause for complaint, either on the part of the then parties in interest, or those who might subsequently become interested either as stockholders or otherwise. Possibly, too, subsequent balance sheets of the company should have disclosed the nature and detail of the whole transaction more fully. It may not be presumptuous here to venture that the accomplishment of such a transaction in the same manner and form, at present, would not be possible. Such a matter now would be subject to rigid governmental regulation, and would necessarily have to pass censorship by the Public Service Commission, and could obtain approval only after thorough investigation and public hearings. There is no doubt but that, if directors of corporations would freely disclose to all stockholders and parties in interest all facts which they were in possession of at the time of the performance of their acts and duties as such directors, criticism thereof would be minimized.

[2] However, it is the duty of this court, and it is but fair and just to all parties, that it should surround itself with the conditions existing at the time of the acts complained of in the complaint herein, and to scrutinize and fairly consider the facts and conditions as they then existed, and well and truly try the issues, and a true judgment render. Thus, though the motive of the plaintiffs, as the defendants vigorously contend, may be deplorable, if, after a fair and careful consideration of all the facts in the record, it then be found that the material allegations of the complaint have been in substance proven, why gainsay that the end did not justify the means? The right of a stockholder to bring such an action as the one in question is salutary, and has not only been recognized by the courts, but strictly enforced by them. The plaintiffs in this action charge fraud and conspiracy, and

whether or not this court should view with suspicion the plaintiff Venner's role in this matter, he must make out a clear case of fraud, and it matters little whether such fraud be termed "actual" fraud, or "constructive" fraud, or what not, a fair preponderance of evidence must disclose fraud—intent to defraud, or at least a fraudulent result, and with reasonable certainty connect the defendants therewith. Extravagance and repetition in allegation thereof, or vehemence and denunciation in denial, avail nothing. The plaintiffs in this case demand that the individual defendants account for 15,000 shares of the capital stock of the Interborough Rapid Transit Company, which plaintiffs allege the said defendants issued, or caused or permitted to be issued, fraudulently, illegally, and without any valid or adequate consideration therefor, but upon an alleged consideration that it was a pretense, and a subterfuge, and intended to cover a gift or bonus to the defendants Belmont and Luttgen, and their nominees.

Said complaint also further charges that the said 15,000 shares were distributed by said defendant Belmont in part to some or all of the other individual defendants, and that the directors of said corporation were his directors, merely the creatures and dummies of said Belmont; that the transaction of May 14, 1902, was a pretense and subterfuge, designed and intended to cover the delivery of a gift or bonus to the said defendants Belmont and Luttgen and their nominees of approximately $1,500,000; that the intention to take such action was concealed, and that each of the individual defendants knew that such action was in fraud of the rights of the corporation; and that the individual defendants strenuously concealed the transaction after its consummation, and instructed the officers of the company to falsely represent the transaction.

[3] Thus it appears clear that the basis or gravamen of the complaint is fraud, conspiracy, and concealment, and the authorities are uniform that, where an action is based upon fraud, the plaintiff, before he can recover, must prove the complaint or substitute another in its place. The law will not permit a recovery by proof of a right of action of some other character, even though facts may be stated, or may appear, which in proper form might sustain such an action. Polhemus v. Polhemus, 114 App. Div. 781, 100 N. Y. Supp. 263, and cases cited; Glover v. National Bank of Commerce, 156 App. Div. 247, 141 N. Y. Supp. 409; Cowell v. McMillin, 177 Fed. 25, 100 C. C. A. 443; Truesdell v. Bourke, 145 N. Y. 612, 40 N. E. 83; Salisbury v. Howe, 87 N. Y. 128; Burk v. Johnson, 146 Fed. 209, 76 C. C. A. 567. It appears that, where an action is based on fraud, it must be shown, in order to entitle plaintiff to recover, that such fraud is actual and intentional fraud involving mala fides on the part of the defendant sought to be charged, and not a mere breach of duty or omission to exercise due care, which are sometimes loosely designated as "legal fraud" or "constructive fraud." Glover v. Bank, supra.

In the action of Kountze v. Kennedy, 147 N. Y. 124, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651, it was held, in an action for fraud consisting of false representations, that something more was necessary than to show that the misrepresentation was false and was

material; that in addition, in order to constitute actionable fraud, it must appear that the misrepresentation was knowingly false, or was made with a disregard as to whether it was true or false; that misjudgment, however gross, or want of caution, however marked, is not fraud. Intentional fraud, as distinguished from the mere breach of duty, or omission to use due care, is an essential feature in an action for deceit.

It is apparent that the plaintiffs in this action do not charge against the defendants a mere breach of duty or a failure to exercise due care, and the allegations of and proof as to concealment do not in any way strengthen plaintiffs' claim or change in any wise the cause of action. In the case of Polhemus v. Polhemus, supra, wherein it was held that:

"It may be that there is evidence tending to indicate that the sum paid was in excess of the actual value of the property received; but there is no evidence in the case that the defendant directors were aware of that fact, or that they voted for the purchase with an intent to cheat and defraud the company. It may be conceded that the defendant directors were negligent in not ascertaining by investigation that they were agreeing to pay more for the property than it was worth, and that for that reason they should be made or compelled to make good the difference. That, however, could only be done in an action upon that theory. It has been suggested that this court could make a finding, upon the evidence, of such negligence in support of the judgment appealed from; but the province of an appellate court is to review a trial actually had, not to try a case de novo, and there should be a hearing and determination of the issue of negligence before that question can be legally reviewed"—citing Levin v. Dietz, 106 App. Div. 208, 94 N. Y. Supp. 419, and other cases.

### The court further stated:

"Moreover, as the judgment herein has been rendered, it must be regarded as one merely for damages because of fraud. The equitable relief sought under the complaint has been denied, and the judgment which has been rendered against the defendant directors, had the action been brought against them by the corporation, would have been a judgment in a common-law action of fraud or deceit. Had an action been brought against them by the corporation to recover damages occasioned by their negligence, it would also be an action, not in equity, but at law"

—and, further, that the burden of proving the fraud alleged in the complaint was upon the plaintiff, and not upon the defendant directors, to show the absence of fraud, and, whatever may be the rule as to a director selling to the company property of his own, it cannot be that as to other directors a presumption of fraud will arise from the mere fact that they have voted to make a purchase of property at a somewhat higher price than its actual value. To the same effect and almost directly in point herewith, is the case of Cowell v. McMillin, 177 Fed. 25, 100 C. C. A. 443.

Defendants claim that in reality what August Belmont & Co. turned over to the corporation exceeded in value the entire stock of the Rapid Transit Company; that had the directors of said company refused to accept the agreement and offer of August Belmont & Co., said August Belmont & Co. would have become possessed of the entire enterprise, as endowed by them, and the Construction Company or its successor,

the Interborough Rapid Transit Company, would have had nothing of any great value—in fact, would have been an empty or paper corporation; that what August Belmont & Co. received was 15,000 shares of stock, and what the Interborough Rapid Transit Company received was a complete railroad enterprise, and, if the subsequent stock quotations are correct, a profitable and valuable one.

[4] As to the charges made by the plaintiffs that the defendant Belmont controlled the incorporators, and nominated and had a controlling influence over the board of directors named on the certificate of the incorporation, and was at one and the same time the vendor and the vendee, the defendants claim that Mr. Belmont of necessity designated the first board of directors of the operating company, but not through usurpation, or in pursuit of any sinister purpose, but because the agreements of 1901 signed by all persons interested in the enterprise expressly authorized it. Defendants claim that Mr. Belmont was guided solely by the desire to bring to the new company the support of names which commanded the confidence of all interested. It may be that there was a necessity at the time of a master hand as well as a master mind for the success of the enterprise; but, standing alone, control, nomination, or domination does not spell fraud, and further evidence than the mere statement is demanded to even call for an explanation from the defendants in this action.

It appears, too, that the incorporators and directors in reality had more than a nominal interest in the company, and their interest was much greater than that of some of them in the so-called McDonald Associates, so that their acts complained of, were more greatly against interest than self-serving. The charge that the individual incorporators and directors divided the said 15,000 shares as spoils of the conspiracy is fully overcome by the fact that the same were divided between Mr. Belmont and his firm, except 1,000 shares, which were given to Mr. McDonald in recognition of his special assistance, as hereinbefore set forth. It appears, also, that the charge that the Pelham Park and City Island Railroads' charters were of no value may be termed unjust criticism, although it seems that such charters were of no great value subsequently.

Defendants contend, further, that in all probability there would have been no enterprise at all without them, since new money could not have been secured with assurance of the possession of an operating franchise, and the acquisition of those charters insured against a forfeiture of the existing investment under the drastic provisions of chapter 752 of the Laws of 1894, and led to the passage of the remedial legislation, which had theretofore failed. It appears that Mr. Belmont substituted for the Pelham Park and City Island charters the charter secured by the legislation of April, 1902, gratis, or inclusive of the 15,000 shares voted to him.

As hereinbefore set forth, the agreements of December 16, 1901, were participated in or authorized by all parties in interest. The defendants claim that the transaction could not or cannot be complained of by one who acquired stock subsequently. Blum v. Whitney, 185

N. Y. 232, 77 N. E. 1159; Barr v. Railroad Co., 125 N. Y. 263, 26 N. E. 145. Thereafter August Belmont & Co. turned over to the enterprise, for a participation certificate of 15,000 shares of the corporation to be formed, the charters of the Pelham Park and City Island Railroad Companies, for which they had expended $272,000 of their own money, and defendants contend that under the agreement of December 16, 1901, August Belmont & Co. had the right to turn these charters over to the operating company to be organized at such price in its participation certificates as they might deem reasonable and proper and without accountability, limited only by the line where a court of equity would say that good faith had ended and fraud begun. Defendants hold that August Belmont & Co. were entitled to make a reasonable profit on this sale to the enterprise, and that the same was pursuant to the contemplation of the parties and within the law, citing Gamble v. Queens County Water Co., 123 N. Y. 91–102, 25 N. E. 201, 9 L. R. A. 527. To the same effect, see Cowell v. McMillin, supra. They point out that, even assuming that this participation certificate could have been converted into cash at par, the amount thereof over and above the mere cost of the Pelham Park and City Island securities was less than 5 per centum of the total intended capitalization of the operating company, which experienced bankers, brokers, and others have held was a reasonable charge and compensatory profit.

Moreover, the defendants point out that Mr. Belmont's offer was a single offer and so described by him, and that his proposal was the turning over to the operating company the entire enterprise as it then existed in exchange for the issue of its entire capital stock, allotment to be made as heretobefore stated; that it was simply a question of take it or leave it, and that the operating company could not adopt in part and repudiate in part. See Barr v. Railroad Co., 125 N. Y. 263, 26 N. E. 145; Pollitz v. Wabash Railroad Co., 207 N. Y. 113–124, 100 N. E. 721. In other words, the defendants' claim is that Mr. Belmont came to the operating company on May 4, 1902; he found it a paper corporation, having no assets other than the right to exist, and when the transaction was consummated he left it endowed with a most profitable railroad enterprise, and what was turned over on that day no one pretends was not worth more than $25,000,000 stock. Further, had the new company declined to take up the obligations of August Belmont & Co., or to recognize their rights, that firm would have been entitled to exercise their express right to abandon the agreements of December, 1901, and to refuse to transfer the interests which theretofore they had gathered into one subway property.

Had the amendment of 1902 not passed, the capital stock of the Pedham Park and City Island Railroads would have been increased in due course to $25,000,000, and the whole thereof would have been exchanged, par for par, for the participation certificates, excluding such as represented the subscriptions of new money. If that had been done, who could have questioned the good faith and propriety of the shares issued to August Belmont & Co. in exchange for their own participation certificates; and would the plaintiffs in the present action have ventured to question the transaction? Further inquiry may also

be made: How can the mere substitution of an operating medium under the subsequent amendment of 1902 affect the matter? It may also be asked: Had Mr. Belmont acted individually, in no way connected with the enterprise as director or otherwise,. and accomplished the same result, would the matter be subject to just criticism, and especially in the absence of actual fraud, concealment, or bad faith? Does not the whole question simmer down solely to that of consideration, adequate or inadequate, dependent upon the angle from which it is viewed?

[5, 6] As to the point, made by the defendants in this action, that the plaintiffs purchased their stock subsequent to the transaction, as complained of in the complaint, it may be sufficient to say that the highest court of this state has definitely determined that a stockholder may bring an action in behalf of the corporation, for the benefit of himself and other stockholders, to set aside fraudulent transactions consummated at the expense of the corporation before he acquired his stock. Pollitz v. Gould, 202 N. Y. 11, 94 N. E. 1088, 38 L. R. A. (N. S.) 988, Ann. Cas. 1912D, 1098. Upon equal authority, it may be stated that acts of directors dealing with a codirector, a presumption exists in equity against the transaction, which the director or trustee dealt with has the burden of explaining.

As to what acts of a board of directors, in dealings with another director or otherwise, can be ratified and confirmed by the body of stockholders, or a majority thereof, as the ultimate parties in interest, and thus make them binding upon the corporation, there has been much written and not altogether uniformily decided. However, in this very case, Continental Securities Company v. Belmont, 206 N. Y. 15, at page 18, 99 N. E. 138, there is provided a pretty clearly defined working rule, to the end that it may be said as now settled what direct or indirect misappropriation of funds or assets of the corporation to his own use or benefit by an officer are or not capable of being authorized or ratified by a vote or by any act or omission of the majority of the stockholders. See Pollitz v. Wabash Railroad Co., 207 N. Y. at page 127, 100 N. E. 721. In the English decision, Bagshaw v. Eastern Union Railroad Co., 7 Hare, 114, the court say:

"No majority of the stockholders, however large, could sanction the misappropriation of this portion of the capital. A single dissenting voice would frustrate the voice of the majority. Indeed, in strictness, even unanimity would not make the act lawful. This appears to me to take it out of the case of Foss v. Harbottle, 2 Hare, 461, to which I was referred. That case does not, I apprehend, upon this point, go further than this: That if the act, though it be the act of the directors only, be one which a general meeting of the company could sanction, a bill by some of the shareholders, on behalf of themselves and others, to impeach that act, cannot be sustained, because a general meeting of the company might immediately confirm and give validity to the act of which the bill complains."

To the sentence, "Indeed, in strictness, even unanimity would not make the act lawful," might be added; for such act of ratification or affirmance might amount to what may be termed subornation of or acquiescence in fraud.

The opinion in the case of Pollitz v. Wabash Railroad Co., supra, also discusses acquiescence and ratification as a defense (207 N. Y.

at pages 129 and 130, 100 N. E. 721); that laches is not a bar to the cause of action therein alleged; and that only the statute of limitations is applicable thereto. Said action was decided by an almost evenly divided court, and the decision of the majority of the court as to the questions raised as to acquiescence, ratification, and laches was vigorously dissented to by three members of the court.

[7, 8] The recently decided case of Billings, as Receiver of the Hudson River Supply Co. v. Shaw and Others, 209 N. Y. 265, 103 N. E. 142, is an action brought by the receiver against defendants, who were directors and salaried officers of said company, to recover the amount of certain property or assets so received by the defendants individually, in which the court held that the transfer of said property, while the legal title thereof was taken by said defendants, the beneficial and equitable title to the same became vested in the said company, and that the defendants received the same as trustees for the benefit of said company and its stockholders. The court therein stated that the duty of a director, under the circumstances disclosed, was first to the corporation and its stockholders in an effort to subserve its and their interest, and that it was the duty of the assignor or transferror of the property, said assignor or transferror having been the president of the said company, as well as the duty of the defendants, to act with the greatest publicity toward the corporation as an existing entity and to the stockholders thereof. The relation of an officer of a corporation to it is fiduciary, and he must at all times act in good faith and unselfishly toward the corporation. Jacobson v. Brooklyn Lumber Co., 184 N. Y. 152, 76 N. E. 1075. So far as it appears, the true arrangement between said assignor or transferror and the defendants was never disclosed to the corporation, nor to the stockholders thereof as such, and the knowledge by the transferror as an individual, under the circumstances disclosed, was not such knowledge by the corporation that it can be charged with acquiescence in what now appears to have been a secret agreement.

The illegality of a profit made by a director arises almost wholly by reason of some undisclosed and secret bias on his part against the interest of the corporation of which he is a director. If a profit is made in a transaction that is honest in itself and is open and fully disclosed, and the transaction is consummated after an honest statement of the facts to the board of directors and to the stockholders, there is no reason for criticism or for charging such director with any profits that he may make. In this case no opportunity was given to the corporation to become the purchaser, directly or indirectly, of the property (its obligations, at a discount); therefore it was held that the defendants, upon the most favorable consideration of the facts in their interest, never gave anything for the transfer to them, except their time, which had already been sold to the corporation. The court found that the defendants ignored their duties as directors of the company and acted in their individual behalf, and, while the defendants received the legal title to the property in dispute, they were not entitled to the beneficiary interest or equitable right therein.

It may be proper to point out that in the present action the plaintiffs have not brought suit against August Belmont or August Belmont & Co., to account to the corporation for property, the legal title to which was received by him or them, but not the beneficial interest or equitable right therein, but on the contrary is an action based on fraud against all of the corporation's directors, none of whom, except as hereinbefore stated, are in any wise shown to have shared therein, and, further, there is a failure of proof that there was any undisclosed or secret bias on the part of August Belmont or August Belmont & Co., against the interest of the corporation, or that the transaction was not consummated after an honest statement of the facts to the board of directors and to the stockholders. It seems rather that the transaction complained of comes within the well-recognized rule (see Cowell v. McMillin, 177 Fed. at page 39, 100 C. C. A. 457):

"That where the director has acted with that candor and fairness which equity imposes as the guide for dealing between him and the corporation, and the transaction is open and free from blame, the director is not forbidden from making a contract with the corporation, or from entering upon a transaction in which he is personally interested."

Assuming that this court should find that the plaintiffs had failed to make out a cause of action for fraud, the question whether the plaintiffs purchased their shares with or *ex* rights to maintain such an action is of little moment. If the plaintiffs have failed to make out a cause of action for fraud, actual or otherwise, the point as to the qualification or disqualification of plaintiffs is not germane, but beside the question.

Further, it appears that the greater part of the stock of the plaintiffs acquiesced in, or ratified and confirmed, the transaction; and whether or not the plaintiffs purchased their stock cum onere, irrespective of whether they had notice of the acquiescence of the prior holder, becomes of little consequence for the reason that this court will assume for the purposes of this decision that the plaintiffs are not wholly disqualified by the acquiescence of plaintiffs' predecessors in title.

Counsel for plaintiffs on trial in substance conceded that plaintiffs were not greatly concerned with the matter of $272,000 paid by August Belmont & Co. for the City Island and Pelham Park securities, and further on in their brief state that 3,000 of the 15,000 shares need not be accounted for, from which it must follow that, had 3,000 shares of stock, instead of 15,000, been allotted to August Belmont & Co., plaintiffs would have no cause for complaint. Plaintiffs contend that the real issue in this action is a very simple one, and may be condensed in this question:

"Are all the essential facts in the complaint admitted or proved by a preponderance of evidence upon the trial?"

Or the issue may be put in this language:

"Did August Belmont illegally receive from the incorporators and directors of the Interborough Rapid Transit Company $1,500,000 of the capital stock of that corporation?"

Plaintiffs' counsel then proceeds to discuss the psychology of the defendants' testimony, and therein of its weight and materiality, and ridicules the contention that each of the defendants is liable to account for all the stock held to be illegally issued. Though such may be technically true, as contended by defendants' counsel, plaintiffs presume and argue:

"But it is quite another thing to say that there is any possibility in the mind of any one of the defendants that Mr. Belmont himself will not pay back to the company the full amount which may be adjudged to have been illegally received at his own instance, and that he will ever allow any of the defendants who received no part of the stock to pay a penny, either in defense of the claim, or in payment of the judgment."

The court is compelled to state (parenthetically) that it will refuse to make any finding either as to Mr. Belmont's means or inclination. Further, plaintiffs' claim that the suggestion in the opening address of the counsel for defendants, that their clients would be thus liable, was pure buncombe, and that the psychological effect of the theatrical tactics of defendants' counsel so stirred the defendants that they were ready in testifying to have their memories refreshed beyond belief. Counsel for plaintiffs argues that the testimony of the witnesses called in behalf of the defendants threw no light upon the issues but only befogged them.

[9] It may be that psychology has been of great benefit to some courts in deciding issues, and in the future may be first aid in deciding all issues, both of fact and law; but, as this court understands its duty, the law is a science which deals with human conduct. It denotes rules and precepts addressed to rational beings, whose wills are free to observe or neglect. them. Recognized precedents and customs, which fulfill certain conditions and which are accorded legal effect, and equitable principles of abstract justice, which owe their binding force to judicial decisions, must guide this court. Law may be an exact science in the conception of the psychologist, who now claims that even banking and business are exact sciences, which can control them as well as any other field of social life, and by the introduction of psychology therein, men will eventually realize that individuals with whom they deal are merely bundles of mental states, and that the mind is a mechanism that we (psychologists?) can affect with the same exactitude with which we control a machine in a factory. With or without the aid of psychology, that great science of mental phenomena that deals with the subjective aspect, which belongs to all facts, this court feels able to grasp that, after a careful consideration of the extensive record in this case, the sole question to be decided is whether the properties turned over and the services rendered by August Belmont & Co. to the Interborough Rapid Transit Company, pursuant to agreement, for which said firm received 15,000 shares of capital stock of said company, were of so small a value, or in substance so ridiculous, that the transaction was unconscionable, and a mere subterfuge or pretense to cover a gift or bonus, and thereby in the eyes of the law amounted to fraud.

The question whether plaintiffs, having no cause of action when the suit was commenced, could or could not, by subsequent purchase of

additional stock and the service of a supplemental complaint, give the action vitality, is of no great importance, unless fraud be found, and has already been disposed of.

[10] Whether the action is barred by the statute of limitations is met by the finding that, if plaintiffs had a cause of action at all under the pleadings herein, it is for fraud, and the ten-year statute of limitations only would apply. Further, that if no fraud be shown, the action falls, and this court is not concerned with any statute of limitation, and such statutes would become important only should a new action be brought for the relief, if any, which plaintiffs may be found entitled to. As to the question whether the defendants in this case are strict trustees, or what are sometimes termed constructive or implied trustees, or trustees ex maleficio, this court is not greatly concerned.

From all the foregoing, it must appear that the sum total of the issues between plaintiffs and defendants is one of fact; that of consideration, valid or adequate. Does the record show that the essential facts in the complaint have been admitted, or proved by a fair preponderance of evidence upon the trial, such evidence as would fairly convince a court and jury that the defendant directors of the Interborough Rapid Transit Company should be required to account to said company for 15,000 shares of its capital stock alleged to have been fraudulently and illegally issued and without any valid or adequate consideration therefor, but upon an alleged consideration that was a pretense and subterfuge and intended to cover a gift or bonus to the defendants Belmont and Luttgen and their nominees? This court is not convinced that the essential facts in the complaint as above stated have been admitted or proven by a fair preponderance of the evidence, and, without deciding whether the facts will permit a recovery by an action of some other character, feels compelled to dismiss the complaint and direct judgment for the defendants, with costs and allowance.

Defendants' findings signed. Submit judgment in accordance therewith.